ARTHUR BERNIER, JR. *vs.* BOSTON EDISON COMPANY
(and a companion case[1]).

Middlesex.  January 7, 1980. — April 11, 1980.

Present: QUIRICO, BRAUCHER, KAPLAN, LIACOS, & ABRAMS, JJ.

*Negligence*, Utility pole.  *Practice, Civil*, Directed verdict, Judgment not-
withstanding the verdict.  *Proximate Cause.  Witness*, Expert.  *Evi-
dence*, Speed of vehicle.  *Damages*, Jury instructions respecting tax
consequences, Interest.  *Interest.  Pleading, Civil*, Amendment.
*Judgment*, Correction of judgment.

In an action by plaintiffs who were injured when they were struck by an
electric light pole which fell after being hit by an automobile, there
was sufficient evidence to warrant findings that the defendant electric
company was responsible for the design and maintenance of the pole
and that the vehicular speed at which the pole would topple was
grievously low, creating an unacceptable risk of grave injury to
pedestrians. [377-382]

In an action by plaintiffs who were injured when they were struck by an
electric light pole which fell after being hit by an automobile, there
was sufficient evidence to warrant a finding that the automobile was
traveling at a nonexcessive speed at impact to which the pole should
have accommodated. [382-385]

In an action by a plaintiff who was injured when she was struck by an
automobile which then struck an electric light pole and toppled it,
there was sufficient evidence to warrant a finding that some of the
plaintiff's injuries resulted from the fall of the pole. [385]

At the trial of a negligence action, there was no error in the judge's in-
structions with respect to probable cause, foreseeability, and the de-
fendant's duty of care. [385-387]

At the trial of a negligence action, the judge's refusal to instruct the jury
that, in figuring damages, they should disregard any possible income
tax consequences to the plaintiffs was not reversible error where the
issue of the taxation of damages was not raised by either the evidence
or the attorneys. [387]

In a civil action, the clerk properly computed interest on the verdict
against the defendant from the date of the original writ even though

---

[1] The party structure of the litigation is described in the text.

the defendant was added as a party nearly two years after the date of the writ. [387-389]

TWO ACTIONS OF TORT. Writs in the Superior Court dated August 28, 1972, and May 2, 1974, respectively.

The actions were tried before *Brogna*, J.

After review was sought in the Appeals Court, the Supreme Judicial Court, on its own initiative, ordered direct appellate review.

*James D. Casey (Louis N. Massery & Arthur L. Johns* with him) for the Boston Edison Company.

*George A. McLaughlin, Jr.,* for Arthur Bernier, Jr.

*John A. Donovan, Jr. (Thomas D. Burns* with him) for Patricia J. Kasputys.

KAPLAN, J. About 2:30 P.M., May 24, 1972, the plaintiffs Arthur Bernier, Jr., and Patricia J. Kasputys, then eighteen and fifteen years old, were let out of school and, after going to Kasputys's house, sauntered to an ice cream parlor on Massachusetts Avenue in Lexington Center, one of the town's major shopping areas. A half hour later, Alice Ramsdell entered her 1968 Buick Skylark automobile parked, pointed east, on the south side of Massachusetts Avenue (which here runs west-east), in the last metered space about fifteen to twenty feet short of where the avenue meets Muzzey Street, a one-way street beginning at the avenue and running south. No traffic signals were posted at the junction with Muzzey Street.

As Ramsdell started her car, she noted, checking her rearview and side-view mirrors, that there was a car — later identified as a Cadillac convertible driven by John Boireau — some seventy-five feet behind her. She wanted to make a right turn on Muzzey Street. Just before pulling out, Ramsdell observed that the Cadillac was much closer to her than before. Boireau, too, wished to turn right onto Muzzey Street. As there were no cars ahead of her before the intersection, Ramsdell thought she could make the turn before the Cadillac interfered.

As Ramsdell was pulling left slightly away from the curb, Boireau passed her traveling (as he said) about five miles an hour. Whether Ramsdell's car then "bolted" out and struck Boireau's car as he was negotiating the right turn, or Boireau turned into Ramsdell's car as the two attempted to make the turn, was the subject of conflicting testimony. So, too, the estimates of Ramsdell's speed on impact with Boireau varied from five to thirty miles an hour. Both drivers said they recognized the trouble and braked, but not before a minor collision occurred some ten to fifteen feet into Muzzey Street intersection, Boireau's right front fender being slightly dented by contact with Ramsdell's left front fender.

What might have been a commonplace collision turned into a complicated accident. On impact, Ramsdell, a woman of sixty-nine, hit her head against her steering wheel and suffered a bloody nose. She testified she "lost complete control of that car." Dazed, she unknowingly let her foot slip from the power brake to the gas pedal. In the result, after veering right around Boireau's car and perhaps slowing slightly, she accelerated across the remaining twenty feet of Muzzey Street, bounced to the south sidewalk, about nine feet wide, of Massachusetts Avenue, and moved about fifty-five feet down the sidewalk. On this passage the car scraped the front of a camera store, hit and levelled a parking meter, struck and damaged extensively the right rear section of a Chevrolet Chevelle automobile (the third parked car beyond Muzzey Street), knocked down an electric light pole owned by the defendant Boston Edison Company (Edison), and struck the plaintiffs who had left the ice cream parlor and were walking side by side west, into the face of the oncoming car. There was much confusion at trial whether, after hitting the meter and car, Ramsdell first hit the pole and then the plaintiffs, or first the plaintiffs and then the pole, but no one denied she hit all three. The car came to a stop two to three feet over the stump of the pole with its left wheels in the gutter and its right wheels on the sidewalk, and in contact with the Chevelle.

The electric light pole, when hit, fell away from Rams-
dell's car toward the east, struck a Volkswagen automobile
parked along Massachusetts Avenue (the fourth car from
Muzzey Street), and came down across the legs of Bernier.
Boireau was able with help to lift the pole off Bernier. Bern-
ier's thighs and left shin bone were broken, the latter break
causing a permanently shortened left leg; and he had other
related injuries. Kasputys lay within two feet of the pole
further in from the curb than Bernier. There was no eye-
witness testimony that she had been struck by the pole. She
was unconscious and vomiting. She suffered a skull frac-
ture on the right side of her head where pieces of metal and
a length of wire were found imbedded, and developed per-
manent pain in her left lower leg.

Bernier in 1972 commenced two actions against, respec-
tively, Ramsdell and Boireau; and in 1974 a separate action
against Edison. Kasputys commenced in 1972 an action
against Ramsdell and Boireau, and in 1974 added Edison as
a party defendant to that action.[2] These complaints alleged
against Edison that it had negligently designed, selected,
constructed, and maintained the pole at Lexington Center.
The cases were consolidated for trial.

The principal witnesses called by the plaintiffs were phy-
sicians who testified (orally or through deposition) about the
agreement of the injuries with the plaintiffs' theories of how
they were caused; two engineers and two supervisors from
Edison's staff, responsible for various aspects of the design
and maintenance of electric light poles, who were examined
on issues of the company's alleged negligence; and a struc-
tural engineer, testifying largely as an expert in concrete
design. Also called was a police investigator.

For the defendants: Ramsdell testified in her own behalf.
Boireau's estate (he had died from unrelated causes) called
three eyewitnesses to the accident; also Boireau's widow,

---

[2] Fathers were originally joined as plaintiffs but were dropped after the
main plaintiffs attained majority. (Minor procedural points are over-
looked in this account.)

who testified to certain statements by Boireau shortly after the accident. Testimony by Boireau at a District Court hearing was read in evidence. Edison cross-examined, but offered no witnesses.

The jury returned verdicts clearing Boireau but holding Ramsdell and Edison liable. Only Edison appealed, and we transferred the case here on our own motion. The company contends: (A) There was insufficient evidence for a jury to find with reason (1) that the pole was negligently designed, selected, constructed, or maintained, or, (2) even if Edison was negligent in some way, that the negligence "caused" the plaintiffs' injuries. Some evidentiary errors are claimed along the way.[3] Hence the judge should have allowed the company's motion for a directed verdict or judgment not-withstanding the verdict. (B) Certain of Edison's requested instructions, including those about nonrecognition of tort recoveries under the income tax laws, were erroneously denied; accordingly the company's motion for a new trial, alternative to judgment n.o.v., should have been allowed. (C) Interest was calculated erroneously on the Kasputys recovery, and corrective postjudgment motions should have been allowed. We hold there was no error.

A. *Refusal of Directed Verdict and Judgment n.o.v.* 1. *Negligence issues.* The plaintiffs did not claim that an otherwise acceptable pole had been rendered dangerous through damage (cf. *Tritsch* v. *Boston Edison Co.,* 363 Mass. 179 [1973]), or that a well designed pole had been carelessly constructed. Rather the gravamen of the plaintiffs' case, as it appeared at trial, was that Edison had failed through negligence to design a pole that was accommodated reasonably to foreseeable vehicular impacts so as to avoid pedestrian injuries, and that the continued use of the pole created an unreasonable risk of such injuries.

---

[3] In its brief, Edison argues the evidentiary questions in relation to the alleged error in denying a directed verdict or judgment n.o.v., not in relation to the denial of a motion for a new trial. The scheme of attack is unimportant, as the evidentiary rulings were correct.

But first, was Edison responsible for the design and use of the pole? — a prerequisite to being held liable for acting unreasonably in these respects. See *Smith* v. *Ariens Co.*, 375 Mass. 620, 621-623 (1978); *Tritsch* v. *Boston Edison Co.*, *supra* at 181.

(a) A jury could find that Edison was the primary designer of this "No. 6" pole — as far as appears, the town had no involvement in the design. It was the task of Edison engineers in the "Technical Methods Division" to draw up "material specifications" for this kind of pole. The company specified the dimensions, material, weight, connectors, static load requirement (weight of the suspended light or luminaire and attaching bracket), base attachments, and perpendicular force (in terms of high winds) that the pole must withstand at its top. After approval by heads of relevant departments to assure that the poles would provide sufficient lighting and could be easily installed by company crews, the specifications were sent to the manufacturers. (Specifications for the No. 6 pole had been thus approved.) In turn the manufacturers drew up more detailed production designs which were sent to Edison for approval. Suggestions by the company would be incorporated and production would begin. The No. 6 type of pole was "codesigned" by the company (according to the head engineer in the Technical Methods Division) and built by American Concrete Corporation.

(b) Control of the poles in place was also substantially vested in the company. It admitted through interrogatories read in evidence that it "own[ed] or maintain[ed]" the No. 6 pole in question. While the town chose the location of the poles, it was the company that required they be placed only twelve inches from the curbing. Edison had a regular crew which circulated among the street lights installed by it to check for failed lights or other defects. Edison would also respond to calls from the police or citizens, send out a crew, and repair or replace the poles. Replacement poles were decided upon by Edison supervisors looking in a "street lighting book" furnished by the company, and the chosen poles

were retrieved from Edison inventory and installed by the Edison crew.  Problems were dealt with without notice to the town.

(c)  As designer or codesigner of the pole and in control of its maintenance, Edison "must anticipate the environment in which its product will be used, and it must design against the reasonably foreseeable risks attending the product's use in that setting." *Back* v. *Wickes Corp.*, 375 Mass. 633, 640-641 (1978).  Certainly the evidence showed that a risk of automobiles colliding with Edison poles — in particular No. 6 poles — was not only foreseeable but well known to the company.  About 100 to 120 Edison poles a year were knocked down in such collisions in Edison's "Northeast Service Center" which included Lexington, although there was no evidence that any in Lexington Center had previously been felled.  A so called "knock down truck" worked steadily replacing downed poles in the district and installing new ones, and there were estimates by employees that in their years of field work they had replaced "thousands" of Edison poles.  One employee said he had been personally involved in replacing at least a hundred poles of the type involved in the accident at bar.

As in the case of vehicles, design should take into account "foreseeable participation in collisions" (*Smith* v. *Ariens Co., supra* at 624).  And for the speeds to be encountered and consequences entailed in collisions, one analyzes the whole "setting."  This was a busy shopping area with heavy pedestrian and vehicular traffics.  Parked cars often lined the street but this was not a safety factor that could be greatly relied on.

(d)  With the duty mentioned, and in the circumstances described, Edison installed this No. 6 pole on February 3, 1949.  It was of reinforced concrete, twenty-six feet nine inches in height, and ran from an eight inch base to a 5 3/8 inch top diameter.  Four anchor bolts held it to a base that extended 4⅔ feet below the surface.  The pole was hollow, allowing for feeder wires to come from an underground cable up to the luminaire.  Implanted in the concrete shaft

were six vertical steel rods, each .375 (3/8) inch thick. Total weight of the pole and luminaire structure was 1,200 pounds.

What precautions were taken in the design to guard against the risk of pedestrian injury through collapse of a No. 6 pole upon impact by a vehicle? According to the evidence, the problem was not seriously adverted to, or so a jury could find. Symptomatic was evidence that no head of a relevant engineering department had authorized a test of Edison poles to determine impact resistance, or knew of such a test. No attempt had been made to design against the risk to pedestrians and no specifications took the impact resistance factor into account. Over-all, the major considerations in Edison's design of poles (including their materials) seemed to be cost, adaptability to Edison's existing system of power supply and connecting apparatus, and capacity of Edison employees to install the poles safely.[4]

(e) Edison's failure to pay serious attention to the risk of pedestrian injury in designing poles is probative of the actual quality of the poles in that respect, but adequate poles might come about by happenstance. It became necessary to examine the design of the poles in relation to possible impacts and, if that yielded unsatisfactory estimates, to consider what alternative designs were available and feasible and at what costs or with what other effects. See *Back* v. *Wickes Corp., supra* at 642. To begin with, since injuries might be serious (as the present case indeed indicated), the likelihood of accidents need not be high to warrant careful consideration of safety features. See *Clough* v. *New England Tel. & Tel. Co.*, 342 Mass. 31, 35 (1961).

---

[4] It is fair to mention, however, that one engineer thought metal poles might have been passed over because they would tend to become electrified when downed and subject pedestrians to shock. Another thought pedestrian safety was adequately handled by having a reputable manufacturer fabricate the poles. There was some indication that Edison did not install so called "breakaway" poles in areas such as Lexington Center because of danger to pedestrians.

The plaintiffs' major witness concerning design safety was Howard Simpson, who had a doctorate in engineering and practiced as a consulting structural engineer. His qualifications as an expert on the strength of reinforced concrete were unchallenged. In his opinion, the concrete of the thickness specified for No. 6 poles lacked "ductility," the quality which would allow a pole, when struck by a car, to absorb part of the impact and bend without breaking. No. 6 would shatter when hit with sufficient force; indeed, one of the Edison supervisors testified about No. 6 that the concrete "all crumbles at the point of impact." As the exposed steel rods could not then support the weight of the pole, it would fall. As to the force sufficient to break No. 6 in this fashion, Simpson testified that the pole would succumb to a 1968 Buick Skylark with a passenger, spare tire, and full gas tank going as slowly as six m.p.h. A medium-sized truck weighing 10,000 pounds could level No. 6 when traveling at 1.5 m.p.h.

Simpson went on to say that the strength of the pole could have been substantially improved by using steel rods of larger diameter or by placing steel "hoops" or "spirals" perpendicular to those vertical rods. In his opinion the latter device would have enabled the pole to withstand the impact of the Buick at 11 m.p.h. — an important advance, as a car going 9 m.p.h. has an energy considerably greater than that at 6 m.p.h. Such hoops and spirals had been in use since the early 1900's in columns for buildings. Simpson calculated the cost per pole of the hoops at $5.75 and the spirals at $17.50.

We should add here that there was evidence from Edison employees of the existence of other pole-types, possibly of greater strength, that would at least have warranted comparison by Edison with the No. 6 pole in respect to safety values. Various metal poles (aluminum and steel) might have deserved such study. Edison's own No. 26, of prestressed concrete, designed in 1968, might have been an improvement.[5]

---

[5] Prestressing in lieu of reinforcing the concrete would allow less material to be used to make a pole of equal strength. No. 26 had eight

(f) Edison attacked the expert's opinion by objections as it was rendered. The expert, argues the company, assumed facts not in evidence: (i) That the Buick Skylark was normal, without added heavy features (such as air conditioning). But the evidence as a whole pointed to a normal car and nothing was introduced to the contrary. See *Kavigian* v. *Lonero*, 312 Mass. 603, 608 (1942). (ii) That the pole was manufactured to conform to Edison's specifications. But as owner and user of the pole, Edison must see to this, and there was no evidence of breach of specifications. (iii) That the pole was manufactured by a certain described process. The inference was within the range of knowledge and experience of this expert, and was not rebutted. See *Kuklinska* v. *Maplewood Homes, Inc.*, 336 Mass. 489, 495-496 (1957); *Finnegan* v. *Fall River Gas Works Co.*, 159 Mass. 311, 312-313 (1893). Any weakness in the assumptions challenged could at most go to the weight of the expert opinion. See *Wilson* v. *Boston Redevelopment Auth.*, 371 Mass. 841, 843 (1977); *Potter* v. *John Bean Div. of Food Mach. & Chem. Corp.*, 344 Mass. 420, 424 (1962).

(g) Edison argues that a finding of negligence here left it in the grip of a "polycentric" problem. If it chose to protect pedestrians by using stronger poles, motorists might be more seriously injured when they hit poles which did not break. If it chose to protect motorists, pedestrians would claim recovery when poles fell on them. No designer or owner, Edison added, is required to make or use a product wholly accident-free. See *Schneider* v. *Chrysler Motors Corp.*, 401 F.2d 549, 557 (8th Cir. 1968). There is some disingenuousness in this argument as the evidence shows Edison paid scant attention in the design of the No. 6 pole to the safety either of motorists or pedestrians. But we think there is nothing in the argument to relieve Edison of a duty to take

reinforcing rods, each .192 inches thick. After its design in 1968, No. 26 poles replaced No. 6's that were knocked down or became defective, but no systematic replacement program was undertaken. The two types were considered "interchangeable." Edison engineers seemed not to have an idea of the impact resistance of No. 26.

precautions against knockdowns by cars, and it would seem reasonable for Edison to consider pedestrian safety with particular seriousness. Persons in a car are protected by a metal and glass shield sometimes three times as heavy as the pole's entire weight; pedestrians are exposed. Whether drivers are hurt any less by impact at similar speeds with poles that topple than with poles that bend rather than fall is unknown to us and apparently to Edison as well. To be sure, many more cars will hit poles than poles will hit pedestrians, but a six m.p.h. threshold for cars, and less for trucks, seems little protection indeed.

(h) To conclude. We recall that a verdict will not be disturbed if "anywhere in the evidence, from whatever source derived, any combination of circumstances could be found from which a reasonable inference could be drawn in favor of [the party resisting the motion for a direction]." *Raunela* v. *Hertz Corp.*, 361 Mass. 341, 343 (1972), quoting from *Kelly* v. *Railway Express Agency, Inc.*, 315 Mass. 301, 302 (1943). Here the jury could rationally find negligence of design and maintenance. They could find that the vehicular speed at which No. 6 would topple was grievously low, creating an unacceptable risk of grave injury to persons at the scene (who in shopping areas such as Lexington Center might be numerous). The impact resistance of the pole could have been improved by relatively minor alterations available at the time and not inconveniencing Edison or the public, or possibly by the use of another type of pole with greater resistance. "In balancing all the pertinent factors, the jury made a judgment as to the social acceptability of the design . . . ." *Back* v. *Wickes Corp., supra* at 642.

2. *"Causation" issues.* (a) Edison contends that its negligence, if any, must be taken not to have contributed in a legal sense to the plaintiffs' injuries because Ramsdell was negligent, or because there was insufficient evidence that the car was traveling at a nonexcessive speed at impact to which the pole ought to accommodate. Impact of a car with a pole could be expected to occur as a result of driver negligence and the design of the pole must take such mis-

haps into account. Thus the mere fact of Ramsdell's negligence is without particular significance. See *Smith* v. *Eagle Cornice & Skylight Works*, 341 Mass. 139, 141 (1960); *Tritsch* v. *Boston Edison Co.*, 363 Mass. 179, 182 (1973); Restatement (Second) of Torts § 431, Comment a (1965). The question reverts to that of speed at impact, and it is perhaps only a manner of speaking to relate this to legal "cause."

The testimony of eyewitnesses as to Ramsdell's rate of speed was quite inconclusive, with the witnesses contradicting each other and sometimes themselves, but there was agreement that the pole was not the first stationary object the car struck. During the moments after Ramsdell's foot slipped, her car hit the edge of the sidewalk, the cement front of a store,[6] a parking meter rooted in the sidewalk, the back right side of the Chevelle, and possibly the two plaintiffs, before it reached the pole. The witnesses' testimony was consistent with a speed much diminished from the original by the time of final impact.

On this matter we have the further testimony of Dr. Simpson in which he rendered an opinion as to speed at impact based on factors which included the weight of the car, its dimensions, the height of the bumper, the damage to the front end, the distance the car traveled after striking the pole, and the pole's strength as he calculated it. For certain of the data he relied on photographs of the aftermath of the accident previously put in evidence as representing the scene. His conclusion, that the car was moving at eight or nine m.p.h., just above the minimum force required to fell No. 6, was corroborated, he thought, by the fact that the pole fell away from Ramsdell's car; if the speed were materially higher, the pole would have fallen toward and over the top of the car.

---

[6] The store front was struck only a few inches beneath its display window which was not cracked by the impact. Edison argues that this was because the car gave the store only a glancing blow. But it also may suggest relatively slow car speed.

Estimating the speed of a vehicle by interpreting the remains of a collision was a matter on which the judge might in his discretion receive expert testimony (see *Jackson* v. *Anthony,* 282 Mass. 540, 544 [1933]), especially as eyewitness accounts were confused.  See *LeMieux* v. *Bishop,* 296 Minn. 372, 377-378 (1973).  Edison objected that Dr. Simpson was not an expert in photo analysis.[7]  But, as an accomplished structural engineer, he had a familiarity with the characteristics of metals as well as of concrete, even though most of his work dealt with the latter.  He was not experienced specifically in the analysis of automobile collisions, but had high qualifications as to impact analysis.  He explained that his calculations did not vary significantly by reason of possible distortion of distances in the photographs.  We think Dr. Simpson was at least as qualified as a long list of persons held entitled to given opinions useful to juries although the subjects were adjacent, not central, to their areas of expertness.  See, e.g., *Joseph DeVries & Sons* v. *Commonwealth,* 339 Mass. 663, 665 (1959); *Reardon* v. *Marston,* 310 Mass. 461, 465 (1941); *Flynn* v. *Growers Outlet, Inc.,* 307 Mass. 373 (1940); *Lenehan* v. *Travers,* 288 Mass. 156, 159 (1934). Moreover, "[i]n determining the qualifications of an offered expert the trial judge has a wide discretion which is seldom disturbed." *Muzi* v. *Commonwealth,* 335 Mass. 101, 106 (1956).

Edison also argued that Dr. Simpson's opinion had an inadequate base because he had not himself observed Ramsdell's car, and, more generally, because some of his data (not all) were drawn from pictures or remoter sources.  But it is surely not a condition of receiving opinions of experts that they shall have derived them entirely from direct personal observation; as to use of pictures, see *Reardon* v. *Marston, supra*; *Bohach* v. *Thompson,* 307 Minn. 332 (1976); *Dahl* v. *Turner,* 80 N.M. 564 (1969); *Kettle* v. *Smircich,* 415 S.W.2d 935 (Tex. Civ. App. 1967); but cf.

---

[7] We disagree with the plaintiff's claim that this point was not preserved on the record.

*Tiemeyer* v. *McIntosh,* 176 N.W.2d 819 (Iowa 1970); *Levine* v. *Remolif,* 80 Nev. 168 (1964). It is of course important that the grounds and assumptions of the opinions be made clear to the triers, and analysis of sources may undermine the inferences and so the final conclusions. Edison had its chance on cross-examination. These attacks went to weight and did not reach admissibility. See *Potter* v. *John Bean Div. of Food Mach. & Chem. Corp., supra; Curtin* v. *Benjamin,* 305 Mass. 489, 492 (1940).

Thus the jury could conclude that Ramsdell's speed was not so great as to free Edison of liability. The jury might not have been able to say at just what place on the speedometer Edison's responsibility for ensuing injury ceased, but they could say that eight or nine m.p.h., or thereabouts, was below that line.

(b) Edison questioned the sufficiency of the evidence purporting to connect Kasputys's injuries to the fall of the pole. She was found within two feet of the pole (and at some distance from the Ramsdell car) and the metal and wire were lodged in that side of her skull nearer the pole. There was no indication that the ground was littered with metal and wire before the accident; but it is known that the luminaire naturally fell with the pole and was shattered. The jury could find that the fixture or parts of it were the source of the head injury and of the matter left embedded. It was not Kasputys's burden to exclude all possibility that Edison's negligence was unrelated to her injuries. See *Carey* v. *General Motors Corp.,* 377 Mass. 736, 740-741 (1979).

B. *Refusal of New Trial.* 1. *Denial of sundry tendered instructions.* Edison did not attack as erroneous the content of the instructions given by the judge as far as they went. But it alleged error in the judge's denial of twenty-four of Edison's requested instructions, of which four do not figure in the company's brief. Eight of those remaining deal with proximate cause and foreseeability, and a like number with Edison's duty of care; four deal with the tax question reserved to point 2 below.

(a) In the charge on cause the judge said the plaintiffs had the burden of persuading the jury that it was more

probable than not that a defendant's negligence was a substantial factor in bringing about injury and harm.[8]  Substantial factor he defined as one "creat[ing] a force or a series of happenings" that led to an accident.  Negligence of other parties was irrelevant to a defendant's liability as long as the defendant's negligence provided a substantial factor.  He said also that to hold Edison liable the jury must conclude that Ramsdell was traveling, at impact, at a "reasonably foreseeable," i.e., nonexcessive speed.  The precise manner of the accident need not have been foreseeable if impacts by moving vehicles were.  Restatement (Second) of Torts § 435 (1965).  Edison's proposed instructions on causation were either adequately covered[9] by the judge's instructions, or were incorrect or misleading.[10]

(b)  As to duty, the judge charged that Edison had a duty "to install or to maintain or use electric light poles in such a manner and of such a design or composition that they will not create an unreasonable risk of injury to people who are lawfully using the streets and the sidewalks."  It had to provide a reasonably safe — not absolutely safe — pole.  In deciding whether Edison had done so, the jury could look to the foreseeable risk of injury to pedestrians when the pole was struck a blow, the technology available at the time, and possibilities and consequences of strengthening the pole.  Edison's proposed instructions were adequately covered,[11]

---

[8] Edison in a proposed instruction numbered 36 suggested that the pole, however negligently designed, was a "condition" rather than a "cause" of the accident, citing in its brief *Kralik* v. *LeClair,* 315 Mass. 323 (1943), and *Leveillee* v. *Wright,* 300 Mass. 382 (1938), both involving suits by owners or drivers of vehicles which crashed into vehicles illegally parked. The idea of "condition" was introduced in explaining that mere violation of an ordinance did not establish liability; it must be shown that the violation tended to create a foreseeable undue risk of accident of the general type that occurred.  A pole of negligent design cannot be seen as a mere condition.

[9] Proposed instructions numbered 14, 15, 21, 34, and 39.

[10] Proposed instructions numbered 17, 22, and 36.

[11] Proposed instruction 43.

or inapplicable,[12] or wrong,[13] or unduly favorable to the company through singling out particular facts.[14]

2. *Denial of tax instructions.* Edison complains of the judge's refusal to charge that, in figuring damages, the jury should disregard any possible income tax consequences to the plaintiffs, for such awards are not regarded as income for purposes of the Federal or State income tax law.[15] Even if the judge should have so charged, it is hard to see his refusal as a ground for reversing the present judgment and ordering a new trial. There is no claim that the amount of the judgment was excessive,[16] nor is there any demonstration that the jury chose to go beyond the judge's charge and to include some amount in their verdict to compensate for prospective taxes payable by the plaintiffs. There was nothing in the evidence bearing on taxes, and the lawyers never spoke of the subject. The prejudice usually required to be shown to justify reversing a civil judgment for an erroneous failure to charge is here quite speculative.

The question whether such a charge should be given is dealt with in *Griffin* v. *General Motors Corp., ante* 362, 369-370 (1980), to which the reader is referred. For the present purpose, the following from *Griffin* is pertinent: "[I]n the absence of any indication that the subject of income taxation was placed before the jury or entered into their deliberations, we are not prepared to hold that refusal to give an instruction on the subject is reversible error." *Id.* at 370.

C. *Interest Computation.* The Kasputys action was begun by writ against Ramsdell and Boireau in August, 1972; a motion to amend the writ and declaration to add Edison as a party defendant was filed in April, 1974, and was

---

[12] Proposed instructions 11 and 20.

[13] Proposed instructions 3, 4, and 9.

[14] Proposed instructions 8 and 41.

[15] The substance of proposed instructions 24-27.

[16] The trial judge refused Edison's application for remittitur and the issue was waived for purposes of appeal.

allowed that month, and summons was served on Edison in May. Upon entry of judgment on the verdict against Edison, the clerk computed interest against the company from the date of the original writ in 1972. By motions to amend the judgment (Mass. R. Civ. P. 59 [e], 365 Mass. 827 [1974]), and for relief from the judgment for clerical mistake (Mass. R. Civ. P. 60 [a], 365 Mass. 828 [1974]), Edison claimed that interest should run only from the date of allowance of Kasputys's motion to add it as a party defendant. The motions were denied.[17]

General Laws c. 231, § 6B, speaks to the matter of interest on the damages awarded for personal injuries or injury to property. When the Kasputys action was initiated, § 6B provided for interest on the amount of damages "from the date of the writ." By St. 1973, c. 1114, § 155, effective July 1, 1974, the statute was amended to conform to the new rules of civil procedure by substituting the words "from the date of commencement of the action."

The language is to be taken literally. Interest is awarded to compensate for the delay in the plaintiff's obtaining his money. See *Murphy's Case*, 352 Mass. 233, 234-235 (1967) ("compensation for the delay in receiving that to which the recipient is forthwith entitled"); *Porter* v. *Clerk of the Superior Court*, 368 Mass. 116, 118 (1975); *H.D. Foss & Co.* v. *Whidden*, 254 Mass. 146, 151 (1925). See also *Carey* v. *General Motors Corp.*, *supra* at 746. In theory interest should run from the date of the injury, and there are many who would advocate such a rule; but the statute seems to yield to the belief that a plaintiff should not be favored with interest until he has complained to the court of the injury; there may also be at work a notion of administrative convenience. The fact that a defendant against whom recovery is had was added late in the lawsuit, should not affect the

---

[17] The rule 59 (e) motion was not made within ten days from entry of judgment and was thus not timely. The rule 60 (a) motion is without limit of time and is the appropriate device for correcting a mistake in the computation of interest. Cf. *Glick* v. *White Motor Co.*, 458 F.2d 1287, 1293-1294 (3d Cir. 1972).

matter; the plaintiff's entitlement to interest in that case also dates from the commencement of the action. Consonant with that conclusion is the rule long established in the Commonwealth that for purposes of limitations the date of commencement of the action tolls the statute even in respect to a transaction-related defendant added after the running of the statutory period. See *McLaughlin* v. *West End St. Ry.*, 186 Mass. 150, 151 (1940); see also *Wadsworth* v. *Boston Gas Co.*, 352 Mass. 86, 89 (1967); *Chandler* v. *Dunlop*, 311 Mass. 1, 6-7 (1942); *Johnson* v. *Carroll*, 272 Mass. 134, 137-138 (1930). And see, now, Mass. R. Civ. P. 15 (c), 365 Mass. 761 (1974).

No case is cited in which the precise interest question has come up in our jurisdiction, but there is Michigan authority in point under a statute that provides: "Interest shall be allowed on any money judgment recovered in a civil action, such interest to be calculated from the date of filing the complaint . . ." (Mich. Comp. Laws Ann. § 600.6013 [1968]). See *Michigan Mut. Liab. Co.* v. *Staal Buick, Inc.*, 41 Mich. App. 625 (1972); *Grand Trunk W. R.R.* v. *Pre-Fab Transit Co.*, 46 Mich. App. 117 (1973); *Awedian* v. *Theodore Ephron Mfg. Co.*, 66 Mich. App. 353 (1976). Michigan takes the Massachusetts view of the statute of limitations in relation to late-added defendants. Louisiana, however, with a statute providing that "[l]egal interest shall attach from date of judicial demand," (La. Rev. Stat. Ann. § 13.4203 [West 1968]), imposes interest "on the party cast in judgment calculated as a general rule from the date that judicial demand was filed against *that* party" (emphasis supplied). *Cook* v. *Deshautreaux & Klein Pediatric Clinic*, 315 So. 2d 405, 406 (La. App. 1975). But that result appears connected to the Louisiana rule that "an amending petition to correct a misnomer does not relate back to the filing of the original petition." *Id.* at 406 n.1.

The result of all this is that the clerk was right in his computation.

Bernier chose to commence a separate action against Edison in May, 1974, instead of attempting to add it as a de-

fendant to his pending action against Ramsdell and Boireau. Here interest runs from the 1974 date. The difference in the results has an appearance of anomaly, but it is faithful to the terms of the statute.

*Judgments affirmed.*