COMMONWEALTH *vs.* WALTER FRANCIS.

Middlesex.   April 4, 1983. — September 8, 1983.

Present: HENNESSEY, C.J., WILKINS, ABRAMS, NOLAN, & O'CONNOR, JJ.

*Identification.   Evidence,* Expert opinion.

Discussion of the admissibility at the trial of criminal cases of expert testi-
    mony concerning the reliability of eyewitness identification. [95-101]
In the circumstances, the judge at the trial of a criminal case did not abuse
    his discretion in excluding expert testimony offered to assist the jury in
    assessing the reliability of eyewitness testimony identifying the defend-
    ant as the man who had committed the robbery in question. [101-102]


INDICTMENTS found and returned in the Superior Court
Department on September 9, 1980.

The cases were tried before *Barton, J.*

The Supreme Judicial Court granted a request for direct
appellate review.

*Susan G. Kauffman* for the defendant.

*Patricia A. McEvoy,* Assistant District Attorney, for the
Commonwealth.

WILKINS, J.   The single issue in this case is whether the
trial judge erred in excluding expert testimony offered to as-
sist the jury in assessing the reliability of eyewitness testi-
mony identifying the defendant as the man who, on July 10,
1976, robbed Alexander's Supermarket in Dracut.   The de-
fendant appeals from his convictions of armed robbery and
of assault and battery by means of a dangerous weapon. We
affirm the convictions.

Although the armed robbery occurred in July, 1976, the
defendant was not arrested and indicted until 1980.   A trial
in November, 1980, ended in a mistrial when the jury could
not agree.   The defendant was convicted at a second trial in
October, 1981.   The chief witnesses against him were Con-

rad Berube, assistant manager of the market, and Betty
Southworth, the courtesy booth clerk. A salient fact in the
defendant's attempt to introduce expert testimony bearing
on the reliability of the eyewitnesses' identification of him is
that Southworth had testified under oath at the 1980 trial
and earlier at a probable cause hearing and before the grand
jury that the person who robbed the store wore a short-
sleeved shirt and had no distinctive features. At the time of
the robbery the defendant had tattoos on his arms. The
1980 jury that could not agree on a verdict saw the tattoos.
After the 1980 trial, Southworth, who was a sequestered
witness at that trial, learned of the tattoos and shortly there-
after advised an assistant district attorney that she remem-
bered that the robber was wearing a long-sleeved jacket. In
February, 1981, the assistant district attorney, complying
with the allowance of a motion for disclosure of exculpatory
evidence, advised the defense counsel of Southworth's
changed "memory."[1]

The defendant then moved for extra fees and costs for ex-
pert assistance to assess the eyewitness testimony. A Superi-

---

[1] The assistant district attorney's disclosure letter states the following:

"Sometime on November 25, 1980 after the jury was sent out to
deliberate, I had a conversation with Ms. Betty Southworth. She had been
a sequestered witness during the trial of *Commonwealth* v. *Walter Fran-
cis*, 80-2577-2578.

"Our conversation related primarily to the defense presented at the trial
by alibi witnesses for the defendant, and the defendant exhibiting his tat-
tooed arms to the jury.

"Sometime shortly after a mistrial was declared, Ms. Southworth
telephoned me at my office. She indicated that she had been unable to
sleep the past night, because she was trying to figure out why she had not
observed the tattoos on the arms of the person who had robbed her. She
stated she was positive the robber's face was the defendant's face and she
now remembers the person who robbed her was wearing a long-sleeved
jacket. She indicated that he had taken the gun out from underneath the
jacket.

"I do not recall what I responded to Ms. Southworth, other than to
thank her for calling and to tell her I would contact her when the case
would be rescheduled for trial.

"I related the substance of my above conversations with Ms. South-
worth to you the following day."

or Court judge denied the motion because the defendant had not shown "what conclusions [the expert] would draw which would not be apparent to the average jury," and, because the evidence would not be admissible, a litigant who could afford to pay would not hire the services of an expert. A Justice of the Appeals Court vacated the order denying the motion and indicated that a motion for extra fees and costs should be allowed. The Justice's memorandum of decision regarded the defendant's request as directed not at the general question of the reliability of eyewitness testimony but specifically toward explaining what effect post-event information concerning the defendant's tattoos may have had on Southworth's current memory.

At the trial Berube identified the defendant as the man who approached him at 8:45 P.M. on July 10, 1976, as he was standing near the market's courtesy booth talking to Southworth. Berube said he was very nervous, too nervous to remember what the robber was wearing or any distinctive features of the robber. The gun in Berube's stomach "looked like a cannon." Southworth then testified that the defendant was the man who robbed her. She said that the robber wore a dark-colored jersey and took a gun from underneath a jacket he was wearing. On cross-examination, she admitted that she had made prior inconsistent statements concerning the robber's clothing. Before the grand jury she had testified that the man wore a short-sleeved jersey and pulled a revolver out from his shirt. She further admitted that, when she testified under oath in November, 1980, she said the man wore no jacket. On these occasions she made no reference to tattoos or other distinctive features. She then testified, on further cross-examination, that after the 1980 trial she overheard a conversation between the assistant district attorney and a police inspector and learned that the defendant had tattoos on his arms. Defense counsel pressed the cross-examination, developing the

inconsistency and questioning the reason why Southworth "put a jacket on the man."[2]

---

[2] The cross-examination in this aspect of the case is as follows:

DEFENSE COUNSEL: "When you heard that information, it didn't fit. The man couldn't have had a short-sleeved shirt without seeing those tattoos?"

THE WITNESS: "That's right."

DEFENSE COUNSEL: "That would have meant you had the wrong man?"

THE WITNESS: "No."

DEFENSE COUNSEL: "Well, you testified at all prior proceedings that the man was wearing a dark, short-sleeved jersey?"

THE WITNESS: "Yes, I did."

DEFENSE COUNSEL: "You testified he had no distinctive marks?"

THE WITNESS: "Yes, I did."

DEFENSE COUNSEL: "You never testified to the presence of any tattoos or marks on his body at all?"

THE WITNESS: "No, I didn't."

DEFENSE COUNSEL: "When you discovered that he did have tattoos, you decided that he was wearing a jacket?"

THE WITNESS: "I thought—"

THE PROSECUTOR: "Objection. Argumentative."

THE JUDGE: "Objection overruled. Go ahead. Answer the question."

THE WITNESS: "I thought — after the trial when I went home that night, I couldn't sleep. I went over and over and over it in my mind."

DEFENSE COUNSEL: "You were trying to find out a way you could have missed the tattoos?"

THE PROSECUTOR: "Objection. May the witness be allowed to finish her answer."

THE JUDGE: "Objection overruled."

THE WITNESS: "No, I was not looking for a reason. I believed that he was wearing a jacket that night. I said, something dark on; and I believe that it was a jacket of the golf-type jacket."

DEFENSE COUNSEL: "Mrs. Southworth, don't you remember saying to [the prosecutor] when asked what he was wearing, he was wearing a jersey-type shirt, no jacket or anything?"

THE WITNESS: "I remember saying that. Yes, I do remember."

DEFENSE COUNSEL: "That was your memory in November of 1980?"

THE WITNESS: "Yes."

DEFENSE COUNSEL: "That was your memory in September of 1980?"

THE WITNESS: "Yes. I did say that."

DEFENSE COUNSEL: "That was your memory in February of 1980; but your memory now is that he was wearing a jacket; is that right?"

THE WITNESS: "Yes."

The night of the robbery Berube and Southworth went to the Lowell police station and looked at photographs. They selected a photograph of the defendant. While looking at numerous books of photographs, Berube and Southworth discussed various photographs, and together they identified a photograph of the defendant. Evidence of the photographic identifications and the circumstances of the identification were introduced through these two witnesses and police detectives.

The defendant presented alibi witnesses tending to show that on the night of the crime he attended a family party in Rhode Island. He exhibited his arms to the jury. The judge then conducted a voir dire to determine whether the testimony of Elizabeth Loftus, Ph.D., and Margaret Hagen, Ph.D., should be admitted. Dr. Loftus has substantial credentials as an experimental psychologist specializing in human memory and perception. She testified that at a high level of stress a person tends to have a reduced ability to remember what he observes. A person focused on a weapon, for example, has a reduced ability to identify the face of the person holding that weapon. She noted that the period

---

DEFENSE COUNSEL: "The only thing that has changed between then and now is that you know he has tattoos, right?"

THE WITNESS: "But I never noticed that he had tattoos. I did not notice. I was looking at his face, not his body."

DEFENSE COUNSEL: "You were able to describe a dark, short-sleeved jersey that the man who robbed you was wearing, is that right?"

THE WITNESS: "That is what I said."

DEFENSE COUNSEL: "Didn't you come, under oath, and tell the Grand Jury, and didn't you testify at the probable cause hearing, under oath, that the man was wearing a dark, short-sleeved jersey?"

THE WITNESS: "Yes, I did."

DEFENSE COUNSEL: "Didn't you also testify that the man had no distinctive marks?"

THE WITNESS: "Yes, I did."

DEFENSE COUNSEL: "After spending a sleepless night wondering how you could have missed that, you now testify that he was wearing a jacket?"

THE WITNESS: "I believe he was, yes."

of time between an event and one's attempt to recall it, the retention interval, is significant because, as a matter of common sense, the longer that interval, the less accurate the memory. Dr. Loftus testified that individuals are susceptible to the influence of post-event information, information supplied to a witness after an event is over. The witness can incorporate post-event information in his memory, thus altering prior memory. She also testified that the introduction of post-event information four years after the event could easily influence memory for a particular detail. Where post-event information conflicts with what the witness has already recalled, the witness will attempt to resolve the conflict. One way to do that "is to have a reorganization in memory that allows for this conflict." The witness is influenced "rather unconsciously" by post-event information and is not lying when the memory becomes altered. There is little relationship between the certainty and the accuracy of witness's identification.

Dr. Hagen, an associate professor at Boston University in the department of psychiatry, testified on voir dire that the principles stated by Dr. Loftus concerning the acquisition, retention, and retrieval of information were generally accepted in the field.

The judge ruled that the expert testimony would not be admitted. He found Dr. Loftus to be "eminently well qualified as an expert in psychology; to wit memory and perception." However, he concluded that "[t]he proposed testimony is *not* beyond the ordinary experience and knowledge of the average juror and would not aid jurors in their deliberations" (emphasis in original). He further concluded that "[t]he proposed testimony is not based on scientific evidence." The defendant then rested and the case was argued to the jury.

Defense counsel presented the jury with a well-constructed argument that Berube's and Southworth's identifications of the defendant were wrong. She focused specifically on Southworth's change of testimony about whether the

robber was wearing a jacket.[3] The jury, however, returned verdicts of guilty.

The issue of the admissibility of expert testimony offered to show the unreliability of eyewitness identification has received increased attention in State courts in recent years. State court opinions almost uniformly have upheld the trial judge's exercise of discretion to exclude such testimony. See, e.g., *People* v. *Plasencia,* 140 Cal. App. 3d 853, 858-859 (1983); *Dyas* v. *United States,* 376 A.2d 827, 831-832 (D.C.), cert. denied, 434 U.S. 973 (1977); *Jones* v. *State,* 232 Ga. 762, 763-766 (1974); *State* v. *Hoisington,* 104 Idaho 153, 165 (1983); *State* v. *Warren,* 230 Kan. 385, 393-395 (1981); *State* v. *Stucke,* 419 So.2d 939, 944-945 (La. 1982); *State* v. *Fernald,* 397 A.2d 194, 197 (Me. 1979); *State* v. *Helterbridle,* 301 N.W.2d 545, 547 (Minn. 1980); *State* v. *Porraro,* 121 R.I. 882, 892 (1979); *State* v. *Onorato,* 142 Vt. 99, 104 (1982). Cf. *State* v. *Galloway,* 275 N.W.2d 736, 738-739 (Iowa 1979) (no abuse of discretion in excluding expert witness's explanation that her opinion concerning the possibility of misidentification was based in part on a particular experiment performed by another); *Hampton* v. *State,* 92 Wis. 2d 450, 454-459 (1979) (no abuse of discretion in not permitting a psychologist to give an opinion as to the reliability of a witness's identification of the defendant,

---

[3] She argued in part:

"What happened to Betty Southworth? I don't know. I don't know whether the process of integrating this information about tattoos is a conscious process or a subconscious process; whether or not she is testifying truthfully or untruthfully because she is too embarrassed to retract the identification that she's made repeatedly. 'That's the man. That's the man. That's the man.'

"She can't go back on it. She's got to do something with the identification. So she puts a jacket on that individual and says, 'I can explain the tattoos.'

"Or whether it is a subconscious process.

"'I laid awake in bed one night tossing and turning trying to remember five years ago. How could I miss the tattoos?'

"Then all of a sudden in a blinding flash, the jacket. That's the way Betty Southworth can save the identification, a mistaken identification that she's made repeatedly; and she can explain the tattoos."

after he was permitted to testify to factors affecting human perception).[4] Contra *State* v. *Chapple*, 135 Ariz. 281, 296-297 (1983).[5] Some opinions have expressed concern about the aura of reliability that the jury may find in expert testimony bearing directly on their own fact-finding role. State court opinions generally note that the matter is within the jury's knowledge and that the defendants' rights can be protected by cross-examination and appropriate jury instructions. They give no particular attention to the circumstances of the eyewitness identification, such as whether a weapon was used, whether the witness was a victim of the crime, or whether the witness made a photographic identification. This is understandable because generally the expert opinions offered did not focus on the capabilities of the particular witness who had identified the defendant but rather dealt generally with problems of

---

[4] The issue of the reliability of eyewitness identification arises commonly in criminal cases and rarely in civil cases. Because the prosecution cannot appeal on evidentiary rulings admitting such evidence, it is not surprising that there are few, if any, opinions dealing with the propriety of admitting expert testimony concerning the reliability of eyewitness identification. But see *State* v. *Galloway*, 275 N.W.2d 736, 740 (Iowa 1979) (Reynoldson, C.J., concurring, questioning the propriety of admitting any such expert testimony in the trial). These Iowa and Wisconsin cases show that such evidence has been admitted on occasion.

[5] This is the only opinion of which we are aware in which an appellate court has held that the trial judge abused his discretion in excluding the testimony of an expert offered on eyewitness identification. The court acknowledged that the great majority of cases had taken a contrary position (135 Ariz. at 293) but concluded that "Dr. Loftus should have been permitted to testify on the peculiar facts of this case." The court stated that it had "no quarrel with the result reached in the vast majority of cases which we have cited above." 135 Ariz. at 297.

It remains to be seen whether the Arizona court will be able to draw a clear line between those cases in which the testimony of an expert on eyewitness identification must be admitted and those in which the trial judge has discretion. A significant difference between our case and the *Chapple* case is the prompt photographic identification of the defendant by both witnesses in our case as against the delay in the *Chapple* case between the time of the crime (December, 1977) and the photographic identification (January, 1979). Also, in the *Chapple* case one witness failed to identify a photograph of Chapple within a week of the crime.

identification under stress and with the ability to recall events.

The Federal cases addressing the same issue uniformly affirm the trial judge's exercise of discretion to exclude such testimony. See *United States* v. *Thevis,* 665 F.2d 616, 641 (5th Cir.), cert. denied, 459 U.S. 825 (1982); *United States* v. *Fosher,* 590 F.2d 381, 382-384 (1st Cir. 1979); *United States* v. *Watson,* 587 F.2d 365, 368-369 (7th Cir. 1978), cert. denied sub nom. *Davis* v. *United States,* 439 U.S. 1132 (1979); *United States* v. *Brown,* 540 F.2d 1048, 1053-1054 (10th Cir. 1976), cert. denied, 429 U.S. 1100 (1977); *United States* v. *Brown,* 501 F.2d 146, 150-151 (9th Cir. 1974), rev'd on other grounds sub nom. *United States* v. *Nobles,* 422 U.S. 225 (1975); *United States* v. *Amaral,* 488 F.2d 1148, 1152-1153 (9th Cir. 1973); *United States* v. *Collins,* 395 F. Supp. 629 (M.D. Pa.), aff'd, 523 F.2d 1051 (3d Cir. 1975). The basic reasoning in the Federal cases is the same whether they deal with matters arising before or after the effective date of Rule 702 of the Federal Rules of Evidence (concerning the admissibility of expert testimony). See Proposed Mass. R. Evid. 702 (1980). A trial judge could reasonably conclude in his discretion that expert testimony would not be likely to add to common understanding of the issue of identification. In short, the subject could reasonably be seen as being within the knowledge of jurors, and the testimony not apt to assist them in determining the identification question.

In Massachusetts, the issue of the exclusion of expert testimony concerning the reliability of eyewitness identification has followed the general pattern. We have upheld, as within the judge's discretion, the exclusion of testimony of a psychologist and a psychiatrist concerning the capacity of identifying witnesses to observe accurately and to remember correctly. *Commonwealth* v. *Jones,* 362 Mass. 497, 502 (1972). In the *Jones* case, however, the trier of fact was a judge and thus the holding could be limited to deciding that the problems of identification were within the

common experience of a judge, as opposed to a jury. In *Commonwealth* v. *Middleton*, 6 Mass. App. Ct. 902 (1978) (rescript), the Appeals Court found no abuse of discretion in the exclusion of expert testimony concerning factors affecting the reliability of eyewitness identification, including stress and the cross-racial nature of the identification. Recently, in *Commonwealth* v. *Sowers*, 388 Mass. 207, 215-218 (1983), we were careful to determine that the jury were not likely to have been misled by the testimony of an ophthalmologist that a legally blind, identifying witness could "identify" the defendant, in the sense of being capable of seeing him.

Our traditional view of what is a proper subject of expert testimony has been that, if other criteria are met, such testimony is admissible if, in the judge's discretion, the subject is not within the common knowledge or common experience of the jury. See *New England Glass Co.* v. *Lovell*, 7 Cush. 319, 321-322 (1851). See also *Commonwealth* v. *Boyle*, 346 Mass. 1, 4 (1963); *Commonwealth* v. *Makarewicz*, 333 Mass. 575, 591 (1956); *Sargent* v. *Massachusetts Accident Co.*, 307 Mass. 246, 249 (1940). We have generally upheld the exclusion of an expert opinion based on a trial judge's determination that the subject matter was within the common knowledge and experience of the trier of fact. See, e.g., *Supreme Malt Prods. Co.* v. *Alcoholic Beverages Control Comm'n*, 334 Mass. 59, 63-64 (1956); *Johnson* v. *Orange*, 320 Mass. 336, 338 (1946); *Meehan* v. *Holyoke St. Ry.*, 186 Mass. 511, 514 (1904); *Perkins* v. *Augusta Ins. & Banking Co.*, 10 Gray 312, 324 (1858). In recent years, without changing basic principles, we have focused on the question whether, in the wide discretion of the trial judge, the subject was one on which the opinion of an expert would have been of assistance to the jury. See *Commonwealth* v. *Gaulden*, 383 Mass. 543, 549 (1981) (expert testimony could be "of some assistance to the jury in understanding" how a lock worked); *Bernier* v. *Boston Edison Co.*, 380 Mass. 372, 384 (1980) ("opinions useful to juries"); *Commonwealth* v. *Fournier*, 372 Mass. 346, 350 (1977) (the expert testimony

gave the jury "appreciable assistance"); *Commonwealth* v. *Boyd*, 367 Mass. 169, 182 (1975) (same). See also 7 J. Wigmore, Evidence § 1923 (Chadbourn rev. 1978) ("But the only true criterion is: On *this subject* can a jury receive from *this person* appreciable help?"); Proposed Mass. R. Evid. 702 (1980) ("If . . . specialized knowledge will assist the trier of fact to understand the evidence or to determine a fact in issue . . .").

The line between common experience and knowledge and matters known only to experts varies with time and circumstances. At any one time, the transition from one type of knowledge to the other is often gradual and cannot be defined precisely. Indeed, there are matters generally within the common experience of lay people that have specialized aspects known only to experts. See 3 J. Weinstein & M. Berger, Evidence par. 702[02] (1982). The decision to admit or to exclude particular expert testimony depends on the circumstances of the case. When the question whether expert testimony would aid the jury is close, the likelihood of prejudice from the admission or exclusion of that testimony is slight. It is not surprising, therefore, that appellate courts have given great deference to the rulings of trial judges in this area of the law of evidence. There have been, however, some occasions in which this court has found reversible error in a trial judge's determination that a subject was or was not one on which expert testimony should be admitted. See e.g., *Commonwealth* v. *Gardner*, 350 Mass. 664, 666-667 (1966); *Doherty* v. *Booth*, 200 Mass. 522, 526 (1909).[6]

---

[6] On the related issue of the qualifications of a person to testify as an expert, we have said similarly that a trial judge's determination on a witness's qualifications will be reversed only for an abuse of discretion or for an error of law. See *Commonwealth* v. *Boyd*, 367 Mass. 169, 182 (1975). In special circumstances, where we could think of no acceptable reason why a person was not qualified to testify and the record showed no such reason, we recently reversed a conviction because the trial judge apparently concluded that a witness was not qualified as an expert and excluded his testimony on an issue on which expert testimony was admissible as a matter of law. *Commonwealth* v. *United Books, Inc.*, 389 Mass. 888, 896 (1983).

One of the most troublesome problems in the administration of criminal justice is the possibility that eyewitness identification testimony is wrong, given by a witness who sincerely but wrongly believes in the accuracy of his or her identification. Substantial constitutional protections have been developed in an attempt to reduce the likelihood of eyewitness misidentifications. See *Simmons v. United States*, 390 U.S. 377 (1968) (photographic identification); *Stovall v. Denno*, 388 U.S. 293 (1967) (showup); *United States v. Wade*, 388 U.S. 218 (1967) (lineup). Courts generally have relied on the cross-examination of identifying witnesses and on the final argument of defense counsel to develop for the trier of fact any weaknesses in identification testimony sufficient to create a reasonable doubt. Further, we have said that, if a defendant fairly raises the issue of mistaken identification, appropriate instructions should be given. *Commonwealth v. Rodriguez*, 378 Mass. 296, 302 (1979). We have thus placed reliance on jury instructions that a witness might honestly have been mistaken in his or her identification of the defendant and advising the jury to consider a number of factors in appraising identification testimony. *Id.* at 310-311.[7]

On the other hand, like almost all other appellate courts, we have not regarded expert testimony concerning eyewitness identification as a standard safeguard against misidentification testimony. Such testimony can prolong a trial, raise collateral issues, and significantly increase the cost of trial. However, these reasons alone would not justify the exclusion of evidence that would assist a trier of fact. The problem is more fundamental.

Experts testifying on the reliability of eyewitness identification may appear to be intruding into an area traditionally and exclusively the function of the jury. We look to the

[7] The judge in this case did charge the jury on identification testimony in accord with our *Rodriguez* opinion. He also instructed the jury appropriately concerning their consideration of prior inconsistent statements.

jury after an adversary trial to make the decision as to what testimony to believe. We permit, indeed require, the judge to instruct the jury concerning factors that bear on the reliability of eyewitness identification. Such a charge may be a checklist of relevant considerations, but it cannot be instructive on what weight to give those various factors in the circumstances. It is at this point that one may fairly contend that the jury would be aided by expert testimony. But that expert testimony, at least in this case and in most cases, deals with general principles, such as the fact that memories fade over time, that people under severe stress do not acquire information as well as alert persons not under stress, and that people tend unconsciously to resolve apparent inconsistencies between their memories and after-acquired facts. Obviously there are aspects of these general principles on which experts might make some contribution in particular cases. However, juries are not without a general understanding of these principles and, as the trial of this case demonstrates, they see the possible application of these principles in concrete circumstances. The jury have the opportunity to assess the witnesses' credibility on the basis of what is presented at trial and not solely on general principles.

We conclude that trial judges should continue to have discretion in these matters. Thus we see no error of law in excluding the expert testimony. The case has not been made that the introduction of the testimony of Dr. Loftus would have assisted the jury in their difficult task. The general points of Dr. Loftus's proposed testimony were covered by defense counsel's carefully prepared cross-examination and final argument. The introduction of such testimony would have prolonged the trial and might have diverted the jury's attention from its basic task.[8] We decline to adopt a rule

---

[8] We have been particularly concerned that juries not be distracted in their fact-finding function by extraneous information having an aura of scientific credibility. See *Commonwealth* v. *Kater*, 388 Mass. 519 (1983) (hypnotically enhanced "memory"); *Commonwealth* v. *Vitello*, 376

of law that would generally require the admission of expert testimony offered on eyewitness identification.[9]  We see no special circumstances in this case that would justify an exception for expert testimony on the effects of postevent information on memory.

*Judgments affirmed.*

---

Mass. 426 (1978) (polygraph).  The judge stated that "[t]he proposed testimony is not based on scientific evidence," which we construe to mean that he concluded that Dr. Loftus's proposed opinions lacked general acceptance in the scientific community.  We need not decide whether the judge was correct in his conclusion.  One interesting question would be whether the proposed testimony could be, as the judge found, both "*not* beyond the ordinary experience and knowledge of the average juror" and also "not based on scientific evidence."

[9] Of course, the considerations will be different if the witness possibly has some physical or mental disability.  See *Commonwealth* v. *Sowers*, 388 Mass. 207, 215-218 (1983); *Commonwealth* v. *Banuchi*, 335 Mass. 649, 655-657 (1957); Annot., 20 A.L.R.3d 684, 688-689 (1968).