[No. E044917. Fourth Dist., Div. Two. July 20, 2009.]

AMANDA LAABS, Plaintiff and Appellant, v.
SOUTHERN CALIFORNIA EDISON COMPANY et al., Defendants and
Respondents.

**COUNSEL**

Lascher & Lascher, Wendy Lascher, Aris Karakalos; Richard Harris Law Firm and Richard Harris for Plaintiff and Appellant.

Brian A. Cardoza for Defendants and Respondents.

**OPINION**

**KING, J.—**

## I.   INTRODUCTION

Plaintiff Amanda Laabs was a passenger in a car that collided with another car in an intersection and then struck a light pole installed and owned by defendant Southern California Edison Company (SCE). Laabs sued various

parties, including SCE and Edison International (Edison), for damages. Relative to SCE and Edison, Laabs alleged that these defendants were negligent and proximately caused her injuries by placing and maintaining the light pole too close to the curb. SCE and Edison moved for summary judgment on the ground that they owed no duty of care to Laabs as a matter of law. The court granted the motion and entered judgment in their favor. Laabs appealed. Because Laabs presented no argument against summary judgment in favor of Edison, we affirm the judgment as to that party. For reasons explained below, we reverse the judgment in favor of SCE.

## II. FACTUAL AND PROCEDURAL BACKGROUND

Laabs was a passenger in a car driven by James Dimeo. Dimeo was driving northbound on Ridgecrest Road, which has a posted speed limit of 55 miles per hour. He was driving at an excessive rate of speed. Dimeo's car was struck by another car at an intersection with Pebble Beach Drive. The impact caused Dimeo's car to travel across the two southbound lanes of Ridgecrest Road, jump the curb, slide along the sidewalk for some distance, and hit a concrete light pole erected 18 inches away from the curb. Laabs was injured. The light pole was owned and maintained by SCE. Laabs sued SCE and Edison on the theory that these defendants acted negligently by installing and maintaining the light pole so close to the curb.[1]

SCE and Edison moved for summary judgment on the ground that "they owed no duty of care" to Laabs. The facts recited above regarding the collision are essentially undisputed. Defendants also rely upon the following undisputed facts: SCE provides electrical service to the City of Victorville pursuant to a written agreement; SCE, not Edison, owned and maintained the subject light pole; the light poles are installed for the benefit of the city; the subject light pole was installed in 1993 and was made of concrete; the side of the light pole facing the street is 18 inches from the curb; at the light pole's location, the paved sidewalk is six feet two inches wide; Dimeo's car slid on the sidewalk "and came to rest with its front end extended well beyond the paved sidewalk";[2] and the light pole was designed to provide light for traffic traveling southbound, not northbound, on Ridgecrest Road.

In support of the motion, SCE and Edison relied primarily upon the declarations of Robert Binns and Y.M. Nahabedian. Binns is a supervisor in SCE's street and outdoor lighting department. He authenticated a "Master

---

[1] Laabs also sued the City of Victorville and the County of San Bernardino. The trial court previously granted summary judgment in their favor. These judgments were affirmed by this court.

[2] Although Laabs did not expressly dispute this fact, she objected to it on the grounds that it is without evidentiary foundation and based upon an inadmissible police report.

Agreement for Service and Street Lighting" entered into between SCE and the City of Victorville in 1977. Under this agreement, light poles are to be installed by SCE at locations shown on a map, which, according to the agreement, is on file with the city clerk. A copy of the map is also purportedly attached as an exhibit to the agreement. However, the copy of the agreement included in our record does not include the map exhibit, and a copy of the map is not otherwise included in our record.[3] The agreement further provides that "[a]ll poles, wires, lights, and electrical apparatus installed by [SCE] . . . shall be so placed as to work the least possible public and private inconvenience, and [the City of Victorville] may at any time order the location of any part of the system changed by [SCE] at the expense of [the City of Victorville] to conform to the above requirements."

Binns further declared that light poles installed by SCE in the City of Victorville are for the benefit of the city. Binns explained that SCE "defers to the appropriate governmental agency for all decisions related to street design and/or traffic engineering," and that the decision regarding the location of the light pole was made by "the City [of Victorville] and/or the developer of the area." The subject concrete light pole was erected in 1993. Although the installation work order for the light pole was not available, Binns stated that he has "seen no evidence to suggest that SCE deviated from its custom and practice with regards to street lighting design and installation with regards to the subject Electrolier." He described such custom and practice as follows: "Typically, the City or developer requesting new street light facilities hires its own engineers, including street lighting engineers, to design the type of system required for the project. Once the plans and permits are secured, SCE's planning department is contacted to co-ordinate the installation of the desired lighting as consistent with the pre-designed plans."

The other declarant in support of the motion, Nahabedian, is a retained civil and traffic engineering expert. According to Nahabedian, the center of the subject light pole was 22 inches from the top of the curb and the curbside edge of the light pole was 18 inches from the top of the curb. The paved sidewalk at the point where the light pole was installed is six feet two inches wide. Nahabedian opined that "the location and the placement of the subject Luminaire was reasonable and was in conformity with the luminaire construction industry's practice in California." Nahabedian relied, in part, upon " 'A Policy on Geometric Design of Highways and Streets' " published by the American Association of State Highway and Transportation Officials. This

---

[3] Attached to Binns's declaration is what Binns describes as an "inventory map" of SCE's structures, which shows the location of "new pole" No. 4412686E (which appears to refer to the pole that replaced the pole that Dimeo struck). It does not appear from Binns's declaration that this inventory map is the map referred to in the agreement. Moreover, the map does not appear to specify the location of the pole in relation to the curb.

document states: "Where there are curbed sections, utilities should be located in the border areas between the curb and sidewalk, at least 0.5 [meters] [1.5 ft] behind the face of the curb, and where practical, behind the sidewalk." The placement of the subject light pole, he states, conforms to these requirements. Nahabedian also relied upon his experience while employed with California's Department of Transportation (Caltrans). He stated that "the standard practice in California . . . is to place luminaire poles along roadways with pedestrian sidewalks behind concrete curbs from 18 inches to 30 inches, depending upon the width of the paved sidewalk. In general, a set-back of 18–24 inches is common placement in paved sidewalks less than 7 feet in width and set-backs of 24–30 inches on paved sidewalks 8 feet or wider." He concludes that the placement of the subject light pole was consistent with this practice.

In her opposition separate statement, Laabs disputes the following conclusions of defendants' experts: the location of the light pole was within "common industry practice and is consistent with industry standards for road construction of the type at issue"; and, "[f]rom a roadside design standpoint, it is unreasonable to require that the Electrolier on the west side of Ridgecrest Road (in the Direction of Southbound traffic) [be] designed to avoid contact by out of control vehicles traveling northbound in excess of 100 miles per hour, which cross four lanes of travel, enter on coming traffic, jump the curb on th[e] opposite side of the street and slide into it."

Laabs also asserted the following "undisputed facts": the intersection of Ridgecrest Road and Pebble Beach Drive has been the site of numerous accidents; the intersection became more dangerous following the widening of Ridgecrest Road in 1996; the installation of the subject light pole was in direct contravention of highway safety standards; 12 feet of space is available for the installation of light poles along Ridgecrest Road; under Caltrans standards, the light poles should have been set back as far as practical from the roadway to prevent the least possible hazards to out-of-control vehicles; the location of the light pole "constituted a dangerous condition"; and the City of Victorville does not design, specify, suggest or approve any specification of a design, manufacture, or process of the light poles provided by SCE. Defendants objected to some of these additional facts as irrelevant and others as lacking foundation or constituting improper expert opinion evidence. The court overruled these objections.

In support of her opposition, Laabs relied primarily upon declarations by John McGlade and Howard Anderson. John McGlade is the city engineer of the City of Victorville. McGlade declared that the light poles on Ridgecrest Road "are owned, installed, maintained, and controlled by [SCE]." He further stated that the "City of Victorville does not design, specify, suggest or

approve any specification of a design, manufacture or process for the [luminaires] or the structures on which the [luminaires] are attached, installed or otherwise provided by [SCE]."

Howard Anderson is an expert in the design and construction of safe highways and roadways. According to Anderson, the average speed of northbound traffic on Ridgecrest Road near the point of the collision was 56 miles per hour, and "the 85th percentile of drivers . . . were traveling at 62 [miles per hour]." Anderson opined that the design of the Ridgecrest Road/Pebble Beach Drive intersection created a dangerous condition. Anderson also made the following statements: "[M]y examination of the subject intersection revealed the installation of lighting and luminaires supports, such as the one struck by the Porsche in the subject accident, in direct contravention of highway safety standards"; "California regulations for traffic highway safety and construction require that any such lights and their luminaires supports must be constructed to present the least possible hazards to out of control vehicles"; "The subject luminaires supports have been installed along the southbound side of Ridgecrest Road leading up to and away from the subject intersection"; "Where lights are installed, lumina[ires] supports are required to be placed as far as possible from the roadway"; "The subject lumina[ires] supports have been placed approximately eighteen (18) inches from the curb line and actually on a pedestrian sidewalk in direct violation of the clear roadside policy"; "It is my expert opinion that the installation of light supports along the southbound travel lanes of Ridgecrest Road created a dangerous condition"; and, "It is my expert opinion that the approval of the design and installation of light supports along the southbound travel lanes of Ridgecrest Road was unreasonable."

At Anderson's deposition, he was asked to explain his statement that the installation of the light pole contravenes highway safety standards. He explained that "it is the State of California's practice, and all other practices, that you get the objects as far back from the travel lane as possible." At the area where the collision occurred, Anderson explained further, the light pole could have been placed as much as 12 feet away from the curb. Anderson also pointed to a statistic that 60 percent of the people in an accident that involves hitting a light pole die as a result; thus, "anybody that is setting them out against the curb should have a real good reason to do it[,] and why not use the right-of-way that is available to lessen that chance of that severe accident."

When Anderson was asked whether the light pole would still be a hazard if it was placed three feet from the curb, he responded: "It could, but it would be less likely, and four feet less likely and five feet and certainly nothing to prevent it from being installed at ten feet because that is still within the

right-of-way . . . ." Later, he added: "The closer any hazard gets to the road, the more hazardous it is, and if it was set back the ten feet, your chances of being hit are considerably less than they are if they're 18 inches."

Laabs also submitted the declarations of Keith Friedman and Robert Crommelin. Friedman is a retained accident reconstruction expert. He declared that, based upon his preliminary analysis, Dimeo was driving at approximately 74 miles per hour at the time of impact.

Robert Crommelin is a retained traffic engineering expert. Crommelin opined that the intersection of Ridgecrest Road and Pebble Beach Drive was in a dangerous condition based upon the "negligent design" of the intersection. He based this opinion, in part, upon evidence of 12 crashes with similar patterns involving a northbound through vehicle and a westbound left-turning vehicle occurring in the 11 years preceding the subject collision.

### III. STANDARD OF REVIEW

A trial court properly grants summary judgment when there are no triable issues of material fact and the moving party is entitled to judgment as a matter of law. (Code Civ. Proc., § 437c, subd. (c).) "The purpose of the law of summary judgment is to provide courts with a mechanism to cut through the parties' pleadings in order to determine whether, despite their allegations, trial is in fact necessary to resolve their dispute. [Citation.]" (*Aguilar v. Atlantic Richfield Co.* (2001) 25 Cal.4th 826, 843 [107 Cal.Rptr.2d 841, 24 P.3d 493] (*Aguilar*).)

A moving party defendant is entitled to summary judgment if it establishes a complete defense to the plaintiff's causes of action, or shows that one or more elements of each cause of action cannot be established. The defendant must support its motion with affidavits, declarations, admissions, answers to interrogatories, depositions, and matters of which judicial notice shall or may be taken. (Code Civ. Proc., § 437c, subds. (b), (*o*)(2); *Aguilar, supra,* 25 Cal.4th at p. 849.)

A moving party defendant bears the initial burden of production to make a prima facie showing that no triable issue of material fact exists. Once the initial burden of production is met, the burden shifts to the responding party plaintiff to demonstrate the existence of a triable issue of material fact. (*Aguilar, supra,* 25 Cal.4th at pp. 850–851.) The plaintiff may not rely upon the mere allegations in its complaint, but must set forth "specific facts" showing that a triable issue exists. (Code Civ. Proc., § 437c, subd. (p)(2).)

From commencement to conclusion, the moving party defendant bears the burden of persuasion that there is no triable issue of material fact and that the

defendant is entitled to judgment as a matter of law. (*Aguilar, supra,* 25 Cal.4th at p. 850.) "In determining the propriety of a summary judgment, the trial court is limited to facts shown by the evidentiary materials submitted . . . . [Citations.] The court must consider all evidence set forth in the parties' papers, and summary judgment is to be granted if all the papers submitted show there is no triable issue of material fact in the action, thereby entitling the moving party to judgment as a matter of law. (Code Civ. Proc., § 437c, subd. (c).)" (*Committee to Save the Beverly Highlands Homes Assn. v. Beverly Highlands Homes Assn.* (2001) 92 Cal.App.4th 1247, 1261 [112 Cal.Rptr.2d 732].)

"On appeal, we exercise 'an independent assessment of the correctness of the trial court's ruling, applying the same legal standard as the trial court in determining whether there are any genuine issues of material fact or whether the moving party is entitled to judgment as a matter of law.' [Citation.] '. . . Moreover, we construe the moving party's affidavits strictly, construe the opponent's affidavits liberally, and resolve doubts about the propriety of granting the motion in favor of the party opposing it.' [Citations.]" (*Seo v. All-Makes Overhead Doors* (2002) 97 Cal.App.4th 1193, 1201–1202 [119 Cal.Rptr.2d 160].)

## IV.  ANALYSIS

### A.  *Introduction*

█    Summary judgment was granted in favor of SCE on the ground that it owed no duty of care to Laabs as a matter of law. As we explain, we will reverse. We note, however, that we do *not* hold that SCE owed Laabs a duty of care as a matter of law; rather, we hold that triable issues of fact exist as to the relevant considerations underlying duty in this case, and that SCE failed to establish that it was entitled to judgment as a matter of law. While we recognize that the issue of duty is a matter for the trial court, it is nonetheless a factually oriented inquiry. As stated in *Burger v. Pond* (1990) 224 Cal.App.3d 597, 603 [273 Cal.Rptr. 709], " 'Foreseeability' and 'policy considerations' are not determined in a vacuum, but rather depend . . . upon the particular circumstances in which the purported wrongful conduct occurred."

### B.  *General Duty of Public Utilities to Use Reasonable Care in the Placement of Light Poles*

█    We begin by noting that the concept that a public utility may owe a general duty to motorists to use reasonable care when placing light poles adjacent to roadways is not novel. In *Gerberich v. Southern Calif. Edison Co.*

(1935) 5 Cal.2d 46 [53 P.2d 948], our Supreme Court stated a "general rule that where a pole is located in too close proximity to the traveled portion of the highway, . . . recovery [by a plaintiff injured in a collision with the pole] may be justified." (*Id.* at p. 53; accord, *Norton v. City of Pomona* (1935) 5 Cal.2d 54, 60–61 [53 P.2d 952]; *George v. City of Los Angeles* (1938) 11 Cal.2d 303, 310–313 [79 P.2d 723].) The *Gerberich* court explained that a public utility's light pole "may by *reason of its location* or maintenance without warning signs, lights, guards or other precautions, constitute a danger to traffic; and if the danger is sufficiently great, and it can be avoided by the exercise of reasonable care, *either in relocation* or the placing of effective warning devices or guards, then the jury might find negligence in the failure to take such steps." (*Gerberich v. Southern Calif. Edison Co., supra*, at pp. 51–52, italics added.) More recently, a Court of Appeal noted the continuing validity of these authorities in *White v. Southern Cal. Edison Co.* (1994) 25 Cal.App.4th 442 [30 Cal.Rptr.2d 431], which stated that a "public utility, which negligently places a power pole too close to the road, may be liable to the occupants of a motor vehicle injured when their vehicle collides with the pole." (*Id.* at pp. 447–448 [dictum].)[4]

---

[4] This is in accord with numerous judicial decisions in other states. (See, e.g., *McMillan v. State Highway Com'n* (1986) 426 Mich. 46, 58–65 [393 N.W.2d 332] [electric company owed duty of care to occupants of vehicle that left roadway and struck utility pole located on median]; *Scheel v. Tremblay* (1973) 226 Pa.Super. 45, 47–48 [312 A.2d 45] [liability of a utility may be imposed when a light pole struck by a motorist is so close to the edge of the road as to constitute a "foreseeable and unreasonable risk of harm to users of the highway"]; *Weiss v. Holman* (1973) 58 Wis.2d 608, 626–627 [207 N.W.2d 660] [utility company may be liable to passenger in a car who was injured when, after a collision, the car struck a light pole four feet off the roadway]; *Mississippi Power & Light Co. v. Lumpkin* (Miss. 1998) 725 So.2d 721, 722 ["utility company may be liable for injuries suffered by a passenger where a negligent driver strikes one of its poles in a public right-of-way, off the traveled portion of a highway"]; *Jacque by & Through Dyer v. Public Serv. Co.* (Colo.Ct.App. 1994) 890 P.2d 138, 140 [summary judgment in favor of utility reversed because a duty of care to motorists may exist even when the accident occurs off the paved portion of a roadway]; *Hayes v. Malkan* (1970) 26 N.Y.2d 295, 298 [310 N.Y.S.2d 281, 258 N.E.2d 695], fn. omitted ["placement of poles . . . in close proximity to the pavement and within the highway right of way, raises a question of fact for jury determination as to whether the placement of that object was such as to create an unreasonable danger for travelers on the highway"]; *State v. Cornelius* (Ind.Ct.App. 1994) 637 N.E.2d 195, 201 [because analytic factors weighed in favor of imposing a duty on a utility company to a motorcyclist who struck utility pole and there were factual issues regarding foreseeability, summary judgment was properly denied]; *Bernier v. Boston Edison Co.* (1980) 380 Mass. 372, 378–382 [403 N.E.2d 391] [electric company liable to injured pedestrians for negligent design and maintenance of light pole that fell on them after being struck by car].) There are also contrary authorities. (See, e.g., *Oram v. New Jersey Bell Telephone Co.* (1975) 132 N.J. Super. 491, 493–495 [334 A.2d 343]; *Simpson v. City of Montgomery* (1968) 282 Ala. 368, 373–374 [211 So.2d 498]; *Coates v. Southern Md. Electric* (1999) 354 Md. 499, 525–526 [731 A.2d 931]; *Rothwell v. West Cent. Elec. Co-op, Inc.* (Mo.Ct.App. 1992) 845 S.W.2d 42, 44.) See generally Annotation, Placement, Maintenance, or Design of Standing Utility Pole as Affecting Private Utility's Liability for Personal Injury Resulting from Vehicle's Collision with Pole Within or Beside Highway (1987) 51 A.L.R.4th 602.

■ Indeed, SCE acknowledges that as the owner of property it has a duty to exercise ordinary care in the management of such property in order to avoid exposing others to an unreasonable risk of harm. (See *Rowland v. Christian* (1968) 69 Cal.2d 108, 119 [70 Cal.Rptr. 97, 443 P.2d 561]; *Brooks v. Eugene Burger Management Corp.* (1989) 215 Cal.App.3d 1611, 1619 [264 Cal.Rptr. 756].) Nevertheless, SCE argues that it did not owe a duty of care to Laabs under the circumstances presented here based upon the application of traditional factors used to find a duty of care.[5] We now turn to an examination of these factors.

## C. *Considerations in Evaluating the Issue of Duty*

■ "The threshold element of a cause of action for negligence is the existence of a duty to use due care toward an interest of another that enjoys legal protection against unintentional invasion. [Citations.]" (*Bily v. Arthur Young & Co.* (1992) 3 Cal.4th 370, 397 [11 Cal.Rptr.2d 51, 834 P.2d 745].) As a general rule, each person has a duty to use ordinary care and "is liable for injuries caused by his failure to exercise reasonable care in the circumstances . . . ." (*Rowland v. Christian, supra*, 69 Cal.2d at p. 112; see Civ. Code, § 1714.) This applies to public utilities, which have "a general duty to exercise reasonable care in the management of [their] personal and real property." (*White v. Southern Cal. Edison Co., supra*, 25 Cal.App.4th at p. 447.)

■ " 'Courts, however, have invoked the concept of duty to limit generally "the otherwise potentially infinite liability which would follow from every negligent act . . . ." ' [Citation.]" (*Bily v. Arthur Young & Co., supra*, 3 Cal.4th at p. 397.) "A judicial conclusion that a duty is present or absent is merely ' "a shorthand statement . . . rather than an aid to analysis . . . . '[D]uty,' is not sacrosanct in itself, but only an expression of the sum total of those considerations of policy which lead the law to say that the particular

---

[5] Edison was also granted summary judgment. It contends that Laabs has effectively abandoned its claim against Edison by failing to make any argument in its briefs on appeal as to Edison. We agree.

Laabs does not refer to Edison in her opening brief. Her factual summary refers only to SCE; the procedural background portion of the brief states that SCE moved for summary judgment without mentioning that Edison was also a moving party; and the arguments made in the brief are directed at SCE only. In the respondents' brief, Edison pointed out the absence of any reference to Edison in Laabs's opening brief and argued that there is no evidence to support the imposition of duty owed by Edison to Laabs. Laabs did not respond to this argument in her reply brief, but continued to focus entirely on SCE. "Although our review of a summary judgment is de novo, it is limited to issues which have been adequately raised and supported in plaintiffs' brief." (*Reyes v. Kosha* (1998) 65 Cal.App.4th 451, 466, fn. 6 [76 Cal.Rptr.2d 457].) Moreover, there is no evidence in the record that Edison had any involvement in the location or installation of, any ownership interest in, or any maintenance obligations regarding, the light pole. The judgment in favor of Edison is therefore affirmed.

plaintiff is entitled to protection.' " [Citation.]" (*Ibid.*) "Whether a given case falls within an exception to [the] general rule, or whether a duty of care exists in a given circumstance, 'is a question of law to be determined [by the court] on a case-by-case basis.' [Citation.]" (*Parsons v. Crown Disposal Co.* (1997) 15 Cal.4th 456, 472 [63 Cal.Rptr.2d 291, 936 P.2d 70].) This determination involves the balancing of various factors, including " '[T]he foreseeability of harm to the plaintiff, the degree of certainty that the plaintiff suffered injury, the closeness of the connection between the defendant's conduct and the injury suffered, the moral blame attached to the defendant's conduct, the policy of preventing future harm, the extent of the burden to the defendant and consequences to the community of imposing a duty to exercise care with resulting liability for breach, and the availability, cost, and prevalence of insurance for the risk involved.' " (*Ann M. v. Pacific Plaza Shopping Center* (1993) 6 Cal.4th 666, 675, fn. 5 [25 Cal.Rptr.2d 137, 863 P.2d 207], quoting *Rowland v. Christian, supra,* 69 Cal.2d at p. 113.)

## D.   *Foreseeability of Harm*

■  "The foreseeability of the harm, though not determinative, has become the chief factor in duty analysis." (*Scott v. Chevron U.S.A.* (1992) 5 Cal.App.4th 510, 515 [6 Cal.Rptr.2d 810] (*Scott*).) Indeed, SCE places heavy emphasis on this factor. Our state Supreme Court discussed the foreseeability analysis in *Bigbee v. Pacific Tel. & Tel. Co.* (1983) 34 Cal.3d 49 [192 Cal.Rptr. 857, 665 P.2d 947]. In that case, the plaintiff was inside a telephone booth located in a parking lot 15 feet away from the curb when an intoxicated driver veered off the street and crashed into the booth, injuring the plaintiff. (*Id.* at pp. 52–54.) The plaintiff sued the entities that installed and maintained the telephone booth, alleging that the booth was negligently located too close to the street. (*Id.* at p. 53.) The defendants moved for summary judgment, which the trial court granted. The Supreme Court reversed. Regarding the issue of foreseeability, the court explained: "In pursuing this inquiry, it is well to remember that 'foreseeability is not to be measured by what is more probable than not, but includes whatever is likely enough in the setting of modern life that a reasonably thoughtful [person] would take account of it in guiding practical conduct.' [Citation.] One may be held accountable for creating even ' "the risk of a slight possibility of injury if a reasonably prudent [person] would not do so." ' [Citations.] Moreover, it is settled that what is required to be foreseeable is the general character of the event or harm—e.g., being struck by a car while standing in a phone booth—not its precise nature or manner of occurrence." (*Id.* at pp. 57–58.)

■  Foreseeability with respect to the analysis of duty must be distinguished from foreseeability in the context of determining negligence (i.e., breach of duty) or causation. The failure to distinguish the variety of roles

played by the concept of foreseeability in tort has caused confusion. (*Scott, supra,* 5 Cal.App.4th at pp. 515–516; *Weissich v. County of Marin* (1990) 224 Cal.App.3d 1069, 1076 [274 Cal.Rptr. 342]; see also *Lopez v. McDonald's Corp.* (1987) 193 Cal.App.3d 495, 507, fn. 6 [238 Cal.Rptr. 436].) As the *Scott* court explained, in analyzing *duty,* the court's task " ' "is not to decide whether a *particular* plaintiff's injury was reasonably foreseeable in light of a *particular* defendant's conduct, but rather to evaluate more generally whether the category of negligent conduct at issue is sufficiently likely to result in the kind of harm experienced that liability may appropriately be imposed on the negligent party." [Citation.] Viewed in this light, the question of foreseeability in a "duty" context is a limited one for the court, and readily contrasted with the fact-specific foreseeability questions bearing on negligence (breach of duty) and proximate causation posed to the jury or trier of fact. [Citation.]' [Citation.]" (*Scott, supra,* at p. 516.) Thus, while foreseeability with respect to duty is determined by focusing on the general character of the event and inquiring whether such event is " 'likely enough in the setting of modern life that a reasonably thoughtful [person] would take account of it in guiding practical conduct' " (*Bigbee v. Pacific Tel. & Tel. Co., supra,* 34 Cal.3d at p. 57), foreseeability in evaluating negligence and causation requires a "more focused, fact-specific" inquiry that takes into account a particular plaintiff's injuries and the particular defendant's conduct (*Ballard v. Uribe* (1986) 41 Cal.3d 564, 572–573, fn. 6 [224 Cal.Rptr. 664, 715 P.2d 624]; see *Scott, supra,* at p. 516). Because SCE sought summary judgment solely on the ground that it "owed no duty" as a matter of law, we are not concerned with these "more focused, fact-specific" inquiries suggested by both respondents and the dissent.

■ The "general character of the event" with which we are concerned in this case is a vehicle leaving a roadway where vehicle speeds commonly reach 62 miles per hour or more and striking a fixed concrete light pole placed 18 inches away from the curb. This could occur in a number of ways: a front tire blowout could cause a driver to lose control of his car; a driver could take evasive action to avoid a hazard and lose control of his car; a car could careen out of control following a collision with another vehicle. All of these events are, of course, easily foreseeable for purposes of an analysis of duty; that is, a vehicle involved in an intersection collision being propelled by the impact over a curb is " 'likely enough in the setting of modern life that a reasonably thoughtful [person] would take account of it in guiding practical conduct.' [Citation.]" (*Bigbee v. Pacific Tel. & Tel. Co., supra,* 34 Cal.3d at p. 57.) We thus find no difficulty in concluding that triable issues exist as to the foreseeability of the general character of the event.

Both SCE and the dissent rely heavily upon the decision in *Scott* to support the argument that the foreseeability of harm is lacking in the present case. In *Scott,* a drunk driver drifted off a highway and hit a guardrail, then veered

back across the highway into opposing lanes of traffic where he collided with another car, killing the driver and injuring passengers of that car. (*Scott, supra*, 5 Cal.App.4th at pp. 513–514.) The State of California placed the guardrail to protect cars from hitting an aboveground gas valve, or "rectifier," that was connected to an underground pipeline maintained by Chevron U.S.A. (*Id.* at p. 514.) Chevron was not consulted about the guardrail and was not involved in the design or installation of it. The family of the driver who was killed sued Chevron on the theory that its location of the rectifier caused the state to erect the guardrail, which in turn created a substantial risk of cross-median accidents. (*Ibid.*)

The *Scott* court affirmed summary judgment for Chevron. The court set forth the applicable rules regarding an analysis of duty, which are substantively identical to those set forth above. (*Scott, supra*, 5 Cal.App.4th at pp. 515–516.) In analyzing foreseeability, the court acknowledged that "certainly it is foreseeable that a vehicle might leave a highway and strike a fixed object located on adjacent property." (*Id.* at p. 516.) The court continued: "However, foreseeability is not commensurate with duty, and the mere placing of a fixed object next to a highway does not necessarily create an unreasonable risk of harm. [Citations.] The only evidence here that the rectifier presented any danger was the state's decision to install a guardrail. [¶] While an argument could possibly be made that Chevron has a duty to protect the public from striking its rectifier, we see no justification for imposing a duty on Chevron to protect the public from cross-median accidents on a highway adjacent to their property." (*Ibid.*, fn. omitted.) Chevron's connection to the accident, the court explained, was "too attenuated," and the "motorist injured by the drunk driver is not the foreseeable victim of the actions of the property owner." (*Id.* at pp. 516–517.) Finally, the court concluded that other factors bearing upon the issue of duty "weigh heavily in favor of finding no duty in this case." (*Id.* at p. 517.)

*Scott* is inapposite. The *Scott* court did not hold that Chevron could not be held liable for injuries suffered by someone who hit its rectifier. Indeed, the court noted that "any concern Chevron might have had regarding persons striking the rectifier was probably alleviated when the state installed the guardrail. Once the guardrail was installed, it was not reasonably foreseeable that the rectifier would cause harm to the motoring public." (*Scott, supra*, 5 Cal.App.4th at p. 517.) Here, of course, there was no guardrail placed in front of the light pole that would have rendered a collision with the pole unforeseeable.[6]

---

[6] Relative to the issue of foreseeability, SCE argues that the decisions in *Gerberich, Norton*, and *George* are distinguishable on their facts. *Gerberich* and *Norton*, SCE points out, "involved accidents at night in which plaintiffs' vehicles struck poorly visible utility poles directly adjacent to their intended lanes of travel." (Boldface omitted.) None of these cases,

Moreover, the *Scott* court determined, in essence, that although Chevron arguably had a duty to protect people from hitting the rectifier, the subsequent events of the state's placement of the guardrail and a drunk driver's hitting the guardrail then veering off into opposing traffic rendered the collision too attenuated from Chevron's actions. (*Scott, supra*, 5 Cal.App.4th at pp. 516–517.) Here, the injured plaintiff, Laabs, was in the car that crashed into the light pole located immediately adjacent to the traveling lanes of the roadway. Her injuries are far more closely connected to the location of the light pole than is the death of the victim in *Scott*.

The *Scott* court itself made clear that its holding should not be read too broadly. In a footnote that is particularly instructive here, the court stated: "We do not mean to imply that a property owner is free to place an object next to a highway with no thought to the possible consequences. For example, property owners may be held liable if they . . . place a fixed object where it is reasonably foreseeable that persons traveling with reasonable care would deviate from the highway in the ordinary course of travel [citation]." (*Scott, supra*, 5 Cal.App.4th at p. 517, fn. 3.)[7] Reading *Scott* in its entirety, it is clear that the unique circumstances presented in that case called for an

they urge, "involved a vehicle which crossed all lanes of travel in broad daylight, veered into opposing traffic and struck a pole on the opposite side of the road, as is the case here." Regarding the foreseeability of an occurrence *for purposes of analyzing a property owner's duty*, however, we are concerned not with the "precise nature or manner of" the collision with the light pole, but with "the general character of the event or harm." (*Bigbee v. Pacific Tel. & Tel. Co., supra*, 34 Cal.3d at p. 58.) The facts that Dimeo was driving northbound before hitting the streetlight adjacent to the southbound lanes, that he was driving during daylight, and other facts concerning the "precise nature or manner of the collision," may well be relevant to a fact finder's decision as to whether the installation of the light pole constituted a breach of SCE's duty or whether the location of the pole was a legal cause of Laabs's injuries. They do not, however, concern us in determining whether SCE had a duty to take reasonable precautions to protect against the risk that vehicles traveling on adjacent roadways at speeds of 50 to 60 miles per hour will collide with its light poles. Thus, although the cited authorities involve different facts and circumstances from the present case, the legal principle for which they stand is applicable and controlling in this case. It is within this vein that the dissent also conflates the issues of duty, breach of duty, cause in fact, and proximate causation. While Dimeo may have been highly negligent, his conduct is not pertinent to the broader question of the foreseeability of vehicles deviating from the traveling lanes.

[7] The court cited to section 368, page 268 of the Restatement Second of Torts, which provides: "A possessor of land who creates or permits to remain thereon an . . . artificial condition so near an existing highway that he realizes or should realize that it involves an unreasonable risk to others accidentally brought into contact with such condition while traveling with reasonable care upon the highway, is subject to liability for physical harm thereby caused to persons who [¶] (a) are traveling on the highway, or [¶] (b) foreseeably deviate from it in the ordinary course of travel." A comment to this section provides: "In determining whether the condition is one which creates an unreasonable risk of harm to persons lawfully travelling on the highway and deviating from it, the essential question is whether it is so placed that travelers may be expected to come in contact with it in the course of a deviation reasonably to be anticipated in the ordinary course of travel. *Distance from the*

exception to the general rule that a property owner placing a fixed object near a roadway owes a duty of care to persons traveling on the roadway. The present case does not call for a similar exception. As explained above, it is reasonably foreseeable (for purposes of the analysis of duty) that a vehicle involved in a collision with another car would "deviate from the highway" and collide with a light pole placed 18 inches from the curb.

E.   *The Closeness of the Connection Between SCE's Conduct and the Injury Suffered*

■   SCE further argues that it cannot be held liable because the locations of the light poles were chosen by the City of Victorville; thus, there is no connection between its conduct and the injury suffered. Courts have repeatedly rejected similar arguments. In *Norton v. City of Pomona, supra,* 5 Cal.2d 54, SCE was sued when a motorist hit one of its light poles that was placed flush with the curb. The light pole was placed pursuant to a city ordinance that gave SCE " 'the right to select the place of location of its poles along the property side of curb lines and flush with said curb.' " (*Id.* at p. 59.) SCE argued in that case that it could not be held liable because the pole was placed and " 'maintained under governmental authorization.' " (*Id.* at p. 58.) The Supreme Court disagreed. " 'That the maintenance of the pole in the place and under the circumstances shown herein cannot be deemed a nuisance . . . for nothing which is done or maintained under the express authority of law can be deemed a nuisance. [Citations.] But while the erection and maintenance of the pole herein appear to have been authorized by ordinance, there still exists a liability on the part of [SCE] for any consequential injuries arising from its negligence in exercising its right and power granted to erect and maintain poles within the City of Pomona.' " (*Id.* at pp. 60–61.) In *Gerberich v. Southern Calif. Edison Co., supra,* 5 Cal.2d at page 52, the court rejected a similar argument, stating: " ' "If the company has a license from a city to construct its poles in the streets, they will not be declared a nuisance, but if they clearly appear to be improperly located thereon, and injury results therefrom, the company will be liable, notwithstanding that it has a license from the city to construct its poles in such places." [Citation.]' " These authorities were followed in *Schauf v. Southern Cal. Edison Co.* (1966) 243 Cal.App.2d 450 [52 Cal.Rptr. 518], which held: "The fact that a utility company may have lawfully installed a structure in a public right-of-way pursuant to a permit or a franchise does not excuse it from tort liability for injuries caused by the negligent exercise of the right and power to erect and maintain the structure." (*Id.* at pp. 459–460.) SCE

*highway is frequently decisive, since those who deviate in any normal manner in the ordinary course of travel cannot reasonably be expected to stray very far."* (Rest.2d Torts, § 368, com. h, p. 271, italics added.)

does not attempt to distinguish these authorities on this point and offers no authority in support of its position.

To the extent SCE's control over the initial placement of the luminaire is of relevance, SCE did not demonstrate that no triable issue of fact exists as to its lack of control. It was undisputed that the luminaire was owned and maintained by SCE. Pursuant to the franchise agreement entered into between SCE and the City of Victorville, it was further undisputed that "[a]ll poles, wires, lights, and electrical apparatus *installed by Company in furnishing service under [the franchise agreement], shall be placed as to work the least possible public and private inconvenience . . . ."* (Italics added.) In achieving this end, there is nothing in the agreement indicating that SCE does not have input and control over the luminaire's placement. And although a map showing the locations of light poles is purportedly attached to the agreement, no map has been provided to us. Nor is it clear from the agreement that, if such a map exists, it prescribes a certain distance from the curb beyond which poles may not be placed. Even if the *final* decision for placement of the luminaire was made by the City of Victorville and/or developer, it does not put to rest the issue of SCE's input into the decision or establish that SCE was precluded from installing luminaires at other, safer locations within or outside of the street right-of-way. Thus, even if a public utility can avoid liability for a negligently placed light pole by claiming a government agency required a precise placement, there is insufficient evidence presented here to establish such a requirement.[8] Simply stated, SCE failed to establish that no triable issue of fact exists as to its role and its exercise of control in determining the placement of the luminaire.

F. *Remaining Factors*

Of the remaining factors relevant to the question of duty, SCE briefly discusses only the factor concerning the burden to SCE of placing the light poles farther from the street. SCE states: "[T]he added costs and inconvenience of engineering poles to be placed a great distance from [the] curb itself becomes unreasonable. With distant placement of poles comes added costs for materials and engineering of longer mast arms to project light to the street they are designed to illuminate." SCE does not, however, refer us to any evidence in the record regarding such added costs. Instead, they rely upon the deposition testimony of Laabs's highway design expert, Anderson,

---

[8] In support of its position that SCE does not have a duty, the dissent places great emphasis on the American Association of State Highway and Transportation Officials manuals and on the declaration of Y.M. Nahabedian, for the proposition that the luminaires were installed in conformance with various standards. While all of this may be well and good, it does not go to the issue of duty. Whether design criteria were complied with goes to the standard in the community and the issue of breach of duty. The present summary judgment was made and granted on the issue of duty, not breach of duty.

for the assertion that Anderson "recognizes that more is involved with placing a pole farther from the curb." In the referenced deposition testimony, Anderson merely acknowledges the obvious—that if light poles are placed so the base is farther from the curb, they would need to have a longer arm length to place the luminaires in the same position above the street. This evidence is insufficient to establish any meaningful additional burden to SCE of installing safer light poles.

On balance, and based on the evidence submitted, other factors relevant to the duty inquiry generally weigh in favor of finding a duty on the part of SCE. The high degree of certainty of serious injury or death resulting when a vehicle collides with a fixed concrete light pole cannot be reasonably disputed. This is especially true when the adjacent roadway is a thoroughfare where motorists commonly drive in excess of 62 miles per hour. According to Anderson, 60 percent of the people in an accident that involves hitting a light pole die as a result. He states the obvious: "The closer any hazard gets to the road, the more hazardous it is, and if [a light pole] was set back the ten feet, your chances of being hit are considerably less than they are if they're [set back] 18 inches." Here, there was 12 feet of space within which to place light poles. Thus, SCE was not as constrained as it would be in the typical urban setting where there may be only three or four feet of sidewalk within which to place a light pole. The same reasoning supports the policy of preventing future harm—the farther away light poles are placed, the less chance that vehicles will collide with them. There would also appear to us to be no negative consequence to the community of imposing such a duty; streets will be just as well lit because the arm that holds the luminaires above the street can be extended to compensate for the additional distance at the pole's base. The factor of "moral blame" tilts in favor of finding a duty; although there is nothing inherently wrong with installing and maintaining streetlights, some moral blame may be found in placing streetlights attached to concrete poles close to the street when they could be placed up to 12 feet away from the traveling portion of the roadway.[9] Finally, our record includes no evidence

---

[9] Our dissenting colleague believes that public policy concerns weigh in favor of finding that SCE owed no duty as a matter of law. He relies upon *Hayes v. Malkan, supra,* 258 N.E.2d 695 for the propositions that our holding " 'would require a landowner to remove every tree, fence, post, mailbox or name sign located on his property in the vicinity or the highway, or permit them to remain, subject to possible liability' " and that our holding is " 'equivalent to a taking of private property for a public use without just compensation.' " (Conc. & dis. opn., *post,* at p. 1295, quoting *Hayes v. Malkan, supra,* at p. 696.) The reliance on *Hayes* is misplaced. In that case, the plaintiff struck a utility pole located on private property. (*Hayes v. Malkan, supra,* at p. 695.) The New York appellate court recited the general rule in that state, which is consistent with our holding here, "that placement of poles or other objects—such as fire hydrants, guardrails, culverts, trees and shrubbery—in close proximity to the pavement and within the highway right of way, raises a question of fact for jury determination as to whether the placement of that object was such as to create an unreasonable danger for travelers on the

regarding the availability, cost, or prevalence of insurance arising from this duty. We cannot, therefore, evaluate this factor one way or the other.

## G. Conclusion

We note that the present matter is on appeal following the grant of summary judgment in favor of SCE. The sole issue is whether the evidence submitted in support of and in opposition to the motion for summary judgment establishes that SCE did not owe a duty to Laabs as a matter of law. We believe that the evidence has not established the absence of a duty. At trial, there may be additional evidence bearing on the issue of duty. Our discussion is not intended to lay the issue of duty to rest as it relates to this matter. We merely hold that, based on the evidence presented, SCE has not established under these circumstances the absence of a duty of care to plaintiff as a matter of law.[10]

## V. DISPOSITION

The judgment is affirmed as to Edison and reversed as to SCE. The parties shall bear their own costs on appeal.

Miller, J., concurred.

**HOLLENHORST, Acting P. J.,** Concurring and Dissenting.—I concur with the majority opinion affirming the trial court's grant of summary judgment in favor of Edison International (Edison), but disagree with the majority opinion reversing the grant of summary judgment in favor of Southern California Edison Company (SCE). As SCE so eloquently observed, "This is a case in search of a viable defendant."[1]

---

highway." (*Id.* at p. 696, fn. omitted.) In *Hayes*, however, the court held that this general rule did not apply because the pole the plaintiff struck was located on *private* property. That distinguishing fact took the case outside the general rule. Because the pole that Dimeo struck in the present case was on *public* property, the *Hayes* decision, as well as the general New York rule, is in accord with our holding.

[10] The dissent characterizes our holding as creating a legal duty on the part of SCE to provide a "safe landing" for intoxicated, speeding drivers. (Conc. & dis. opn., *post*, at p. 1286.) We do nothing of the kind. Under settled California law, SCE owes a duty to exercise reasonable care with respect to its placement of light poles. In moving for summary judgment in this case, it was SCE's burden to establish that this duty did not apply to Laabs as a matter of law. Based on the record in this case, SCE failed to satisfy this burden. Our holding is no more or less than this.

[1] Clearly, the combination of plaintiff's catastrophic injury and the depth of defendant's pocket warrants the continued search.

## I. FACTS AND PROCEDURAL BACKGROUND

On October 24, 2002, at approximately 2:00 p.m., Amanda Laabs (Plaintiff) suffered injuries resulting from a car accident on Ridgecrest Road where it intersects with Pebble Beach Drive. Ridgecrest Road is a four-lane north/south roadway.[2] The southbound lanes are owned and controlled by the City of Victorville (City), while the northbound lanes are owned and controlled by the County of San Bernardino (County). Plaintiff was one of three passengers in a northbound car (1999 Porsche Carrera) driven by James Dimeo. Dimeo took the Porsche (his parents' car) without permission to show his friends how fast the car could go. He reached a speed of 100 to 110 miles per hour.

The accident occurred when Dimeo's car hit a westbound, left-turning car driven by Dorothy Specter. As a result of hitting Specter's car, Dimeo's car was forced across Ridgecrest Road's southbound lanes, jumped the curb, slid along the sidewalk for some distance, and then hit a concrete light pole,[3] causing the pole to break at the base. Dimeo was cited for driving under the influence of alcohol or drugs, unsafe speed, and failure to yield the right of way. Plaintiff lost both of her legs.[4] The light pole was owned and maintained by SCE. Plaintiff sued SCE and Edison,[5] among other parties,[6] as a result of the injuries she incurred from the accident. Plaintiff alleged that her injuries were caused by the negligent installation and maintenance of the light pole close to the curb.

SCE and Edison moved for summary judgment on the ground that "they owed no duty of care to [P]laintiff." They argued that "although SCE owns and maintains the subject electrolier, it was installed per the [City's] engineering specifications and the decisions regarding placement [were] left solely to that body." Edison "had nothing to do with the installation of the pole and has no ownership interests in it."

In support of the motion, SCE and Edison offered the declaration of Robert Binns (Binns), a supervisor in SCE's street and outdoor lighting department.

---

[2] Five lanes at the intersection.

[3] Herein sometimes referred to as an "electrolier" or "luminaire."

[4] Dimeo suffered cuts and abrasions to his face and hands, one passenger suffered cuts and abrasions to his hands and complained of back pain, and the other passenger lost his life.

[5] On September 19, 2005, Plaintiff identified SCE and Edison as two Doe defendants in her second amended complaint.

[6] Plaintiff also sued the City and the County. Summary judgments in their favor were affirmed by this court in previous appeals (*Laabs v. County of San Bernardino* (May 11, 2007, E039694) [nonpub. opn.]; *Laabs v. City of Victorville* (2008) 163 Cal.App.4th 1242 [78 Cal.Rptr.3d 372]).

Binns stated that "SCE provides electrical service to the streetlights in the area where the incident occurred pursuant to a Master Agreement for Service and Street Lighting as between SCE and [City]." He further stated: "Although SCE owned and maintained the Electrolier it was the City and/or the developer of the area which made the decision with regards to the: 1) location of installation; 2) type of equipment to use; 3) mounting height; 4) type of light fixture; and 5) wattage (light output) required. SCE does not make the final decision with regards to placement of Electroliers [or] the type of facilities to be used. Typically, the City or developer requesting new street light facilities hires its own engineers, including street lighting engineers, to design the type of system required for the project. Once the plans and permits are secured, SCE's planning department is contacted to co-ordinate the installation of the desired lighting as consistent with the pre-designed plans." Attached to the declaration of Binns was a copy of "Agreement for Service for Street Lighting" (Agreement). In relevant part, the Agreement provides: "All installations shall be made at locations as shown on Map No. R-121 on file in the office of the City Clerk, which said plan was filed on October 20, 1966, in proceedings for the establishment of said street lighting, pursuant to Resolution of Intention No. 77-26." No Map No. R-121 was attached.

Additionally, SCE and Edison offered the declaration of Y. M. "Ed" Nahabedian (Nahabedian), an independent consulting civil and traffic engineer. Between 1970 and 1985, Nahabedian was an area traffic engineer who was "responsible for overseeing traffic operational and safety issues on numerous freeways, expressways, conventional highways and local streets in Los Angeles, Orange and Ventura Counties." His responsibilities included supervising and initiating investigations for, inter alia, street and safety lighting. He was retained by SCE and Edison as an expert. In that capacity, he opined that "the location and the placement of the subject Luminaire was reasonable and was in conformity with the luminaire construction industry's practice in California." Nahabedian further opined that because the placement of the luminaire conformed "with the requirements set forth in the State's Traffic Manual and AASHTO[7] Manual," it "did not present a risk of injury to foreseeable motorists using due care, let alone a substantial risk."

In formulating his opinion, Nahabedian reviewed many documents, including "sections of the Department of Transportation's (CalTrans) Highway Design and Traffic Manuals and Standard Plans, AASHTO . . . 2004 Edition of 'A Policy on Geometric Design of Highways and Streets' and 'Roadside Design Guide.' " Based on his review of the Department of Transportation (CalTrans) traffic manual, there was no horizontal setback placement of luminaire poles placed on paved sidewalks behind concrete curbs. Also, "review of AASHTO 'A Policy on Geometric Design of Highways and

---

[7] American Association of State Highway and Transportation Officials (AASHTO).

Streets,' 2004 edition . . . relative to placement of luminaire poles and utility poles states, 'Where there are curbed sections, utilities should be located in the border areas between the curb and sidewalk at least 0.5 meters (1.5 feet) behind the face of the curb, and where practical, behind the sidewalk.' "

Nahabedian further stated: "During the time when I was employed by the Department of Transportation (CalTrans) in Traffic Operation Branch, I have designed and reviewed many intersection signal designs and safety lighting on State's expressways and conventional highways. As a result of this experience I have become familiar with the operation and safety features of placement and location of signal standard poles, safety lighting poles and luminaire poles. [¶] Statewide, the standard practice in California (both on State level and local jurisdictions) is to place luminaire poles along roadways with pedestrian sidewalks behind concrete curbs from 18 inches to 30 inches, depending upon the width of the paved sidewalk. In general, a set-back of 18–24 inches is common placement in paved sidewalks less than 7 feet in width and set-back of 24–30 inches on paved sidewalks 8 feet or wider."

In opposition to the motion for summary judgment of SCE and Edison, Plaintiff offered the declarations of John A. McGlade, the City's engineer, Keith Friedman, an expert in reconstruction and occupant protection, Robert W. Crommelin, a professional traffic operations engineer, and Howard Anderson, a retired engineer. Plaintiff argued that "SCE was negligent in the placement of its light posts . . . ." According to Plaintiff, there was a conflict between the City and SCE with regards to "who placed the light post in a dangerous position . . . ." Plaintiff cited to the City's claim that it "does not design, specify, suggest or approve any specification of a design, manufacture or process for the [luminaires] or the structures on which the [luminaires] are attached, installed or otherwise provided by [SCE]." However, this claim did not address the decision of where the luminaires are placed. The City did not claim that SCE was responsible for determining the location of the luminaires. Nonetheless, Plaintiff argued that SCE owed her a duty, which was breached, because "SCE should have known that placing light posts so close to the sidewalk could aggravate injuries resulting from car accidents on Ridgecrest . . . ."

In support of Plaintiff's argument, McGlade noted the Agreement between SCE and the City and stated that the City "does not design, specify, suggest or approve any specification of a design, manufacture or process for the [luminaires] or the structures on which the [luminaires] are attached, installed or otherwise provided by [SCE]." However, McGlade did not claim that SCE

was responsible for the location of the luminaires. Further, he did not deny that the City was responsible for the location of the luminaires.[8]

Anderson stated that "the installation of lighting and luminaires supports, such as the one struck by [Dimeo] . . . [is] in direct contravention of highway safety standards." He declared that "California regulations for traffic highway safety and construction require that any such lights and their lumina[ires] supports must be constructed to present the least possible hazards to out of control vehicles." Furthermore, without any reference to any authority, he claimed that "[w]here lights are installed, lumina[ires] supports are required to be placed as far as possible from the roadway." Thus, Anderson opined, "the approval of the design and installation of light supports along the southbound travel lanes of Ridgecrest Road was unreasonable." However, in his deposition, Anderson acknowledged that CalTrans standards requiring placement of luminaires as far back as possible are for California highways. Although he opined that the placement of the luminaires on Ridgecrest violated CalTrans standards, he admitted there was no criminal violation.

After considering the argument of counsel in light of the evidence offered, the trial court granted SCE and Edison's motion for summary judgment and entered judgment in their favor. Plaintiff appealed.

## II.  MAJORITY'S FLAWED PREMISE

In reversing the summary judgment in favor of SCE, the majority concludes that "triable issues exist as to the foreseeability of the general character of the event" (of a vehicle leaving the roadway and striking a fixed, concrete light pole). (Maj. opn., *ante*, at p. 1273.) Implicit in such conclusion is the assumption that the public utility, in this case SCE, controlled the decision of the location of the light pole. However, there is no evidence in the record before this court that supports such assumption. Instead, both Plaintiff and the majority have misinterpreted the declaration of McGlade. McGlade declared that the light poles on Ridgecrest Road "are owned, installed, maintained, and controlled by [SCE]." He further stated that the City "does not design, specify, suggest or approve any specification of a design, manufacture or process for the [luminaires] or the structures on which the [luminaires] are attached, installed or otherwise provided by [SCE]." While McGlade's declaration supports a finding that SCE owned, maintained, controlled, and installed the luminaire, it does not support any finding that SCE was responsible for determining the actual place where the luminaire would be located. Rather, the evidence offered in support of SCE's motion clearly points out that SCE installed the luminaire per the map provided by the City.

---

[8] This point was noted at the trial court level.

Because no map was attached to the Agreement, the majority reasons that it is unclear as to whether the map prescribed a certain distance from the curb beyond which poles may be placed. (Maj. opn., *ante*, at p. 1277.) Moreover, the majority opines that "[e]ven if the *final* decision for placement of the luminaire was made by the City of Victorville and/or developer, it does not put to rest the issue of SCE's input into the decision or establish that SCE was precluded from installing luminaires at other, safer locations within or outside of the street right-of-way." (*Id.* at p. 1277.)

I disagree.

To begin with, the record before this court dictates that placement of a light pole is not left to the discretion of a utility company. In order for a developer to develop land with homes, streets, etc., he/she/it must obtain the approval of and permits from the local governmental entity (city or county). As Binns stated, "[a]lthough SCE owned and maintained the Electrolier it was the City and/or the developer of the area which made the decision with regards to the . . . location of installation . . . . SCE does not make the final decision with regards to placement of Electroliers [or] the type of facilities to be used. Typically, the City or developer requesting new street light facilities hires its own engineers, including street lighting engineers, to design the type of system required for the project. Once the plans and permits are secured, SCE's planning department is contacted to co-ordinate the installation of the desired lighting as consistent with the pre-designed plans." For the majority to assume or speculate that SCE had any control on the placement of the light pole defies the record, common sense, and logic.

Second, the fact that SCE owned, controlled, or maintained the luminaire is irrelevant. As Plaintiff argued at the trial level and on appeal, it was not the luminaire itself that caused her injuries; rather, it was the location of the luminaire at close proximity to the street.

Finally, SCE's expert, Nahabedian, opined that "the location and the placement of the subject Luminaire was reasonable and was in conformity with the luminaire construction industry's practice in California." He further opined that because the placement of the luminaire conformed "with the requirements set forth in the State's Traffic Manual and AASHTO Manual," it "did not present a risk of injury to foreseeable motorists using due care, let alone a substantial risk." Nahabedian further declared that the CalTrans traffic manual does not establish a horizontal setback placement of luminaire poles placed on paved sidewalks behind concrete curbs. Furthermore, review of AASHTO's " 'A Policy on Geometric Design of Highways and Streets,' 2004 edition . . ." showed that, as for placement of luminaire poles " '[w]here there

are curbed sections, utilities should be located in the border areas between the curb and sidewalk at least 0.5 meters (1.5 feet) behind the face of the curb, and where practical, behind the sidewalk.' " Regarding intersection signal designs and safety lighting, "the standard practice in California (both on State level and local jurisdictions) is to place luminaire poles along roadways with pedestrian sidewalks behind concrete curbs from 18 inches to 30 inches, depending upon the width of the paved sidewalk. In general, a set-back of 18–24 inches is common placement in paved sidewalks less than 7 feet in width and set-back of 24–30 inches on paved sidewalks 8 feet or wider."

In contrast, Plaintiff's expert, Anderson, offered no support for his conclusion that the approval of the installation of the light pole was unreasonable. He cited no manuals, guidelines, etc. Instead, he merely asserted that "lumina[ires] supports are required to be placed as far as possible from the roadway." He further asserted that placement of the light poles 18 inches from the curb line and on pedestrian sidewalk are "in direct violation of the clear roadside policy." However, unsupported assertions are not evidence. (*Parsons v. Crown Disposal Co.* (1997) 15 Cal.4th 456, 463, fn. 2 [63 Cal.Rptr.2d 291, 936 P.2d 70].)

Given the above, I disagree with the majority's premise that the issue of SCE's input into the decision of where to place the luminaire remains open. (Maj. opn., *ante*, at p. 1277.) Clearly, the developer and/or the local government, acting in accordance with the requirements set forth in the CalTrans traffic manual and AASHTO's manuals, were responsible for such placement.[9]

## III. DUTY

From the majority's flawed premise, it engages in a lengthy discussion of duty, concluding that "SCE has not established . . . the absence of a duty of care to plaintiff as a matter of law." (Maj. opn., *ante*, at p. 1279, fn. omitted.)

Under the facts in this case, I disagree. By failing to conclude that SCE owed no duty to Plaintiff as a matter of law, the majority leaves open the door for a finding that SCE's legal duty to Plaintiff included a duty to

---

[9] The majority discounts my emphasis on the AASHTO manuals and the declaration of Nahabedian, arguing that it is irrelevant to the issue of "duty." (Maj. opn., *ante*, at p. 1277, fn. 8.) According to my colleagues, while "the issue of duty is a matter for the trial court, it is nonetheless a factually oriented inquiry." (*Id.* at p. 1269.) Quoting *Burger v. Pond* (1990) 224 Cal.App.3d 597, 603 [273 Cal.Rptr. 709], the majority notes that " ' "Foreseeability" and "policy considerations" are not determined in a vacuum, but rather depend . . . upon the particular circumstances in which the purported wrongful conduct occurred.' " (Maj. opn., *ante*, at p. 1269.) In this case, I find that all of the particular circumstances affecting the decision of where to install the light pole are relevant given Plaintiff's claims against SCE.

disregard the direction of the City's engineers, the CalTrans traffic manual or AASHTO's manuals, when placing its light poles. Moreover, SCE may now be under a legal duty to provide a "safe landing" for an intoxicated, speeding driver who is not using the road in accordance with the purpose for which it was designed. The circumstances of this case do not warrant leaving such door open. Accordingly, I would affirm the trial court's grant of summary judgment for SCE.

The majority cites case law which states that a public utility owes a general duty to motorists to use reasonable care when placing light poles adjacent to roadways, namely, *Gerberich v. Southern Calif. Edison Co.* (1935) 5 Cal.2d 46, 53 [53 P.2d 948] (*Gerberich*), *Norton v. City of Pomona* (1935) 5 Cal.2d 54, 60–61 [53 P.2d 952] (*Norton*), *George v. City of Los Angeles* (1938) 11 Cal.2d 303, 310–313 [79 P.2d 723] (*George*), and *White v. Southern Cal. Edison Co.* (1994) 25 Cal.App.4th 442, 447–448 [30 Cal.Rptr.2d 431] (*White*). (Maj opn., *ante*, at pp. 1269–1270.) None of these cases involves the same factual scenario presented in this case.[10] More specifically, *Gerberich*,

---

[10] In *Norton*, the public utility was held liable for damages the Nortons sustained when their automobile, by reason of a dangerous condition in the street, ran upon and over the curb and crashed into a utility pole (maintained by the public utility) within the curb line but flush with the curb along the street. (*Norton, supra*, 5 Cal.2d at pp. 57–58, 59.) The intersection in question was described as a rounded corner with no sidewalk that contained a space between the curb and the property line that was used by the public when turning the corner. (*Id.* at p. 59.) This space was not part of the roadway; however, at night it appeared to be a turn lane because the surface was " 'level with the curb and street pavement and in wet weather and darkness would present the appearance of a used highway.' " (*Id.* at p. 59.) Unlike the situation in *Norton*, here the luminaire was not in a location that was commonly used by motorists, and it was visible during the day or night.

In *Gerberich*, the plaintiffs' daughter was killed when the car she was riding in hit a junction pole (support wires) erected and maintained by the public utility. (*Gerberich, supra*, 5 Cal.2d at pp. 48–49.) The street consisted of concrete pavement 24 feet wide, bordered on each side by a two-foot strip of macadam and unpaved the balance of the width of the highway. (*Ibid.*) The pole was 1.3 feet in diameter with its center placed six feet from the edge of the concrete, or four feet from the edge of the macadam shoulder. It was black, unmarked and bore no light. (*Id.* at p. 49.) According to the record, the dirt portion of the road was frequently traversed on both sides of the pole when traffic was congested. The driver of the car swerved to avoid hitting another car, ran onto the dirt shoulder, and continued until he hit the pole. (*Ibid.*) In contrast, in this case the luminaire was visible, there was no evidence that cars traveled around it, and there were a curb and sidewalk to alert motorists to keep away from the area.

In *George*, the plaintiff was injured when a dip or depression in the street caused his vehicle to swerve into the curbing and hit a pole. (*George, supra*, 11 Cal.2d at pp. 305–306.) The court noted that the defective condition was part of the traveled section of the street itself. (*Id.* at p. 309.)

In *White*, the plaintiff was injured in a motor vehicle accident that occurred in the evening at an intersection near an inoperative streetlight owned and maintained by SCE. (*White, supra*, 25 Cal.App.4th at p. 445.) Reference to *Gerberich, George*, and *Norton* was made in passing.

*Norton*, and *George* each involved a dangerous condition in the street.[11] Nonetheless, the majority discredits the distinguishing factors as irrelevant to this court's determination of whether SCE had a duty to take reasonable precautions to protect against the risk that vehicles traveling on adjacent roadways will collide with its light poles. (Maj. opn., *ante*, at pp. 1273, 1274–1275, fn. 6.) According to the majority, any distinguishing factors are relevant only to a fact finder's decision, not ours, because this court is concerned only with the "general character of the event." (*Id.* at p. 1273.)

I disagree.

" 'An action in negligence requires a showing that the defendant owed the plaintiff a legal duty . . . .' [Citation.] 'Whether a "duty" exists in a particular case is a question of law. "Duty" is merely a conclusory expression used when the sum total of policy considerations lead a court to say that the particular plaintiff is entitled to protection.' [Citation.] Duty is an allocation of risk determined by balancing the foreseeability of harm, in light of all of the circumstances, against the burden to be imposed. [Citation.] In determining the existence of duty, '. . . the major [considerations] are the foreseeability of harm to the plaintiff, the degree of certainty that the plaintiff suffered injury, the closeness of the connection between the defendant's conduct and the injury suffered, the moral blame attached to the defendant's conduct, the policy of preventing future harm, the extent of the burden to the defendant and consequences to the community of imposing a duty to exercise care with resulting liability for breach, and the availability, cost, and prevalence of insurance for the risk involved.' [Citation.]" (*White, supra*, 25 Cal.App.4th at p. 447; see also *Ann M. v. Pacific Plaza Shopping Center* (1993) 6 Cal.4th 666,

[11] The majority notes these authorities were followed in *Schauf v. Southern Cal. Edison Co.* (1966) 243 Cal.App.2d 450 [52 Cal.Rptr. 518]. (Maj. opn., *ante*, at p. 1276.) In *Schauf*, the plaintiffs were injured when the driver of their car ran a stop sign and collided with another vehicle. (*Schauf, supra*, at p. 453.) SCE and the county were sued on the theory that they "negligently maintained a hazardous condition at the intersection in that the visibility of the stop sign (installed by the county in 1940) controlling west-bound traffic . . . was obstructed by an [SCE] power pole (installed by [SCE] in 1937 under a county franchise)." (*Ibid.*) As to SCE, the plaintiffs claimed that it was liable because its power pole obscured the stop sign creating a traffic hazard of which SCE had constructive knowledge but which SCE negligently failed to remedy. (*Id.* at p. 458.) The jury agreed. On appeal, this court noted the issue was not whether "the pole by itself, either because of its location or condition, constituted a hazard to motorists. The dangerous condition, if one existed, consisted of the relationship of the stop sign to the pole. The question [was] whether that relationship was created or maintained by [SCE], either independently or jointly with the county." (*Id.* at p. 460.) We concluded that SCE did not create or maintain the unsafe condition; however, we found a question as to whether, "by having constructive knowledge of the dangerous condition and the power to correct it by relocating its pole, [SCE] had a duty to take steps to guard motorists against the danger." (*Id.* at p. 461.) Here, Plaintiff contends it is the location of the pole that constituted the hazard to motorists. However, there is no evidence that the light pole in this case is positioned any differently than other light poles located on similar streets.

674 [25 Cal.Rptr.2d 137, 863 P.2d 207] (*Ann M.*); *Rowland v. Christian* (1968) 69 Cal.2d 108, 112–113 [70 Cal.Rptr. 97, 443 P.2d 561] (*Rowland*).)[12]

Recognizing that this state has found certain situations where a public utility owes a general duty to the public (specifically, as noted by the case law above, placing utility poles adjacent to roadways), I note that this state has also found exceptions to the general duty rule. This case is ripe for such exception. (*Scott v. Chevron U.S.A.* (1992) 5 Cal.App.4th 510, 518 [6 Cal.Rptr.2d 810] (*Scott*).)

In *Scott*, a drunk driver struck a guardrail, crossed the center median, and struck the plaintiffs' car. (*Scott, supra*, 5 Cal.App.4th at p. 513.) The plaintiffs sued Chevron U.S.A., the owner of the property adjacent to the guardrail, because it had placed a piece of fixed electrical equipment on the property and the state later placed a guardrail between the shoulder of the road and the equipment. (*Id.* at p. 514.) The issue on appeal was whether Chevron had a "duty to exercise care in the location and maintenance of its [equipment] in order to avoid exposing persons on the adjacent highway to an unreasonable risk of harm." (*Id.* at p. 515.)

Regarding duty, the *Scott* court stated: "Duty is not an immutable fact of nature; it is 'only a shorthand expression of the sum total of public policy considerations which lead the law to protect a particular plaintiff from harm. [Citations.]' [Citation.] In order to determine the boundaries of the duty to prevent injury to others in any given case, we consider several factors, including the foreseeability of the harm, the degree of certainty of injury, the closeness of the connection between the defendant's conduct and the injury suffered, the moral blame attached to the defendant's conduct, the policy of preventing future harm, the extent of the burden to the defendant and the consequences to the community of imposing a duty to exercise care with the resulting liability for breach, and the availability, cost, and prevalence of insurance. [Citations.]" (*Scott, supra*, 5 Cal.App.4th at p. 515.)

Recognizing that the foreseeability of harm has become the chief factor in duty analysis, the *Scott* court applied the *Rowland* factors and concluded that Chevron owed no duty to the plaintiffs as a matter of law. (*Scott, supra*, 5 Cal.App.4th at p. 518.) Acknowledging it is foreseeable that a vehicle might leave the road and strike a fixed object placed on adjacent property, the *Scott* court stated that "foreseeability is not commensurate with duty, and the mere placing of a fixed object next to a highway does not necessarily create an

---

[12] The majority notes our state Supreme Court's discussion of foreseeability in *Bigbee v. Pacific Tel. & Tel. Co.* (1983) 34 Cal.3d 49, 52–54, 57–58 [192 Cal.Rptr. 857, 665 P.2d 947]. (Maj. opn., *ante*, at p. 1272.) I note that *Bigbee* analyzed foreseeability as a jury question (*Bigbee, supra*, at p. 56), not the legal question presented by the duty analysis in our case. (*Ann M., supra*, 6 Cal.4th at p. 674.)

unreasonable risk of harm. [Citations.]" (*Id.* at p. 516.) The court went on to say that "other *Rowland* factors similarly weigh heavily in favor of finding no duty in this case." (*Ibid.*) Specifically, the court noted that "there is nothing inherently wrong with placing a fixed object on one's property. While future harm might be prevented by holding property owners responsible whenever a fixed object on their property contributes to injuries suffered on adjacent highways, we doubt that society is willing to so restrict property rights. Imposing liability in these circumstances would effectively require landowners to dedicate a portion of their property as a safety zone to protect errant drivers. [Citation.]" (*Ibid.*) Our colleagues in the First District, Division One, aptly noted that such decision should be left to the Legislature. (*Ibid.*)

Reading *Scott* in its entirety, the majority concludes "it is clear that the unique circumstances presented in that case called for an exception to the general rule that a property owner placing a fixed object near a roadway owes a duty of care to persons traveling on the roadway. The present case does not call for a similar exception." (Maj. opn., *ante*, at pp. 1275–1276.)

I disagree.

As noted in a footnote in the majority opinion, numerous cases have discussed the issue of a utility company's liability when a vehicle leaves the roadway and hits one of its utility poles. Of those cases cited, the following are most significant: *Bernier v. Boston Edison Co.* (1980) 380 Mass. 372 [403 N.E.2d 391] (*Bernier*); *Oram v. New Jersey Bell Telephone Co.* (1975) 132 N.J. Super. 491 [334 A.2d 343] (*Oram*); *Coates v. Southern Md. Electric* (1999) 354 Md. 499 [731 A.2d 931] (*Coates*); and *Rothwell v. West Cent. Elec. Co-op, Inc.* (Mo.Ct.App. 1992) 845 S.W.2d 42 (*Rothwell*).

In *Bernier, supra*, 403 N.E.2d 391, two pedestrians were injured when a car ran into a light pole, causing it to fall. (*Id.* at pp. 393–394.) In considering the utility company's possible liability, the appellate court noted that the company was the primary designer of the utility pole, the company required that the pole be placed 12 inches from the curbing, and the company did not have the poles tested to determine impact resistance. (*Id.* at pp. 395–396.) Accordingly, the court concluded that a jury could find negligence of design and maintenance. (*Id.* at p. 398.) In contrast, here, SCE installed its light poles at the location determined by engineers employed by the City or developer in compliance with the CalTrans traffic manual and the AASHTO manuals.

In *Oram, supra*, 334 A.2d 343, passengers were injured when their car collided with a telephone pole located two feet from the travelled portion of a

road. (*Id.* at p. 344.) The car was on a four-lane highway when another vehicle forced it off the road. The plaintiffs claimed the utility company was negligent in placing its pole two feet from the traveled portion of the road where there was no shoulder or curb. (*Ibid.*) The trial court disagreed and the appellate court affirmed. The court concluded that the placement of the pole was not the proximate cause of the injury. (*Id.* at p. 345.) Furthermore, the court stated that "[n]o telegraph or telephone company may erect utility poles upon, along, over or under any public road, . . . without first obtaining permission . . . from the governing body of the municipality in which it is to be located. [Citation]." (*Ibid.*) Thus, the court concluded that a utility company is not a "free agent in the placement of its . . . poles . . . but must conform to the dictates of a local governing body . . . ." (*Ibid.*) Such is the case before this court. SCE is not a free agent in placement of its light pole. The location of light poles along roadways is an important decision which, according to the record before this court, is determined by engineers employed by the City or developer in compliance with the accepted guidelines such as CalTrans's Highway Design and Traffic Manuals and Standard Plans, and AASHTO manuals, including the 2004 edition of "A Policy on Geometric Design of Highways and Streets" and the "Roadside Design Guide." According to expert testimony, the light pole in question here conformed with the requirements stated in these manuals.

In *Coates, supra*, 731 A.2d 931, the plaintiffs were injured when their vehicle slid out of control and hit a utility pole. (*Id.* at p. 933.) Reviewing Maryland's case law regarding the issue of a utility company's liability when a pole is hit, the court noted that liability was found "only when (1) the utility chose the location of the pole, free from governmental direction, and (2) the pole created a danger to persons while on the traveled portion of the road." (*Id.* at p. 938.) As for outside of Maryland, the court observed: "Although some of the cases take somewhat doctrinaire positions, either as to foreseeability, proximate cause, or, as in New York and New Jersey, on strict public policy grounds, most of the courts, in their recent decisions, have adopted a more flexible approach." (*Id.* at p. 943.) The court agreed with that approach, concluding (1) a utility company has a duty not to endanger those traveling on the roadway set aside for lawful travel; (2) if a governmental body approved the placement of a utility pole, the company has complied with any duty owed to those on the road; (3) a utility company may anticipate that those using the road will do so in a lawful and reasonable manner; and (4) a utility company has no duty to make any massive engineering inspection of all of its existing poles. (*Id.* at pp. 944–945.) Thus, summary judgment was affirmed in favor of the utility company on the ground that the company "had no duty to anticipate that a vehicle traveling in a posted 35 mile per hour zone would go so out of control as to spin across the oncoming lane and

strike a pole that was at least 14 feet from the edge of the lane in which the vehicle was traveling." (*Id.* at p. 945.)

In *Rothwell, supra,* 845 S.W.2d 42, a driver was killed after he lost control of his car, crossed to the other side of the road, hit an electrical pole, and a fallen line electrocuted him. (*Id.* at pp. 42–43.) Summary judgment for the utility company was affirmed on the grounds that it was "not reasonably foreseeable that someone would veer across the center lane, into an embankment and then hit a pole some 8 to 11 feet away from the other side of the road." (*Id.* at p. 44.)

Moreover, in *Armand v. Louisiana Power & Light Co.* (La.Ct.App. 1986) 482 So.2d 802 (*Armand*), a driver was rendered a quadriplegic after her car went into a spin and hit a utility pole. The driver had a blood-alcohol content of 0.30 percent. (*Id.* at p. 803.) Judgment against the utility company was reversed with the appellate court holding that the "location and design of defendant's transmission pole was not the cause-in-fact of the accident." (*Id.* at p. 804.) The court found that the utility company had "no obligation to guard against rare exigencies such as an out of control vehicle leaving a traveled roadway." (*Ibid.*) The same reasoning used in *Coates, Rothwell,* and *Armand* applies to the facts of this case.

Again, I note "[t]he existence and scope of a defendant's duty is a question of law for the court's resolution. [Citations.]" (*Salinas v. Martin* (2008) 166 Cal.App.4th 404, 412 [82 Cal.Rptr.3d 735].) Foreseeability is a significant factor in determining the existence of a legal duty, as well as its scope. (*Id.* at p. 415.) "[T]he scope of the duty is determined in part by balancing the foreseeability of the harm against the burden of the duty to be imposed. [Citation.] ' "[I]n cases where the burden of preventing future harm is great, a high degree of foreseeability may be required. [Citation.] On the other hand, in cases where there are strong policy reasons for preventing the harm, or the harm can be prevented by simple means, a lesser degree of foreseeability may be required." [Citation.]' [Citation.]" (*Ann M., supra,* 6 Cal.4th at pp. 678–679.)

Did SCE owe Plaintiff a duty to take advance precautions to protect her from the harm she suffered as a result of the car accident caused by Dimeo? The answer is "no," because the accident could not have been reasonably foreseen.

As the above cases demonstrate, car accidents involving utility poles located along roadways are a possibility. However, this fact does not create a "duty" on the part of a defendant to ensure a "safe landing." If it did, the defendant would be required to eliminate *all* possibilities of risk. This is

simply not possible. "All possibilities of risk even if 'foreseeable' in the abstract as possibilities cannot be eliminated." (*Whitton v. State of California* (1979) 98 Cal.App.3d 235, 244 [159 Cal.Rptr. 405] (*Whitton*).) All that a defendant is required to do is to protect a plaintiff from all reasonably foreseeable risks. (*Bryant v. Glastetter* (1995) 32 Cal.App.4th 770, 778 [38 Cal.Rptr.2d 291] [" 'In order to limit the otherwise potentially infinite liability which would follow every negligent act, the law of torts holds defendant amenable only for injuries to others which to defendant at the time were reasonably foreseeable.' "].) To expect that most people will drive properly is not negligence. Thus, the chance that an unusual accident will occur is not the test of foreseeability.

As SCE points out, "[t]he general scenarios in which an errant northbound vehicle could leave Ridgecrest Road, cross all opposing lanes of travel and strike a stationary object on the other side of the road are virtually endless. It would be impossible to guard against all such eventualities. Consider the random speeds, trajectories and chain of events (including ricocheting off of other vehicles and structures) that would make planning against these situations impossible. It is enough that in planning the streetlights on the south side of Ridgecrest to be safe for adjacent southbound travelers the designers considered that relation of the poles to southbound traffic. In this regard, the planners (City of Victorville) apparently did a good job as there is no evidence that placement of the Streetlight caused any injuries to southbound traffic at any time since its installation in 1993." Clearly, there are some risks that are not reasonably foreseeable. Thus, there is no duty. Such is the case before this court.

Nonetheless, the majority maintains that a "vehicle leaving a roadway where vehicle speeds commonly reach 62 miles per hour or more and striking a fixed concrete light pole placed 18 inches away from the curb" is "easily foreseeable for purposes of an analysis of duty . . . ." (Maj. opn., *ante*, at p. 1273.) However, "[t]his is not the foreseeability upon which the law of negligence is based. The conduct of [SCE] was not the cause-in-fact or the substantial factor in law in bringing about the harm to the plaintiff. When the law says a person substantially contributes to the injury, the law is dealing with responsibility based on reasonable expectations and a commonsense approach to fault not physics. [Citations.] Therefore, even if the likelihood of [a speeding car losing control and hitting a light pole] . . . can be calculated in terms of mathematical probabilities, such mathematic computation is immaterial." (*Whitton, supra*, 98 Cal.App.3d at p. 243.)

More importantly, the facts of this case do not warrant treating it as simply a "vehicle leaving a roadway . . . and striking a fixed concrete light pole placed 18 inches away from the curb." (Maj. opn., *ante*, at p. 1273.) Dimeo's

conduct was criminal. He was under the influence of drugs or alcohol and he was driving in excess of 100 miles per hour. He was using the road as a racetrack to test the speed of his parents' Porsche. When he hit another car, the Porsche was forced across three 12-foot-wide lanes (36 feet) and over the eight-inch-high curb, where the car continued to skid along the curb until it hit the light pole. Although Dimeo was driving northbound, his vehicle hit a light pole located on the southbound side of the road. Such conduct was not a natural or typical consequence of the placement of a light pole on the side of the road nor was the foreseeability of the likelihood of that conduct one of the factors contributing to the negligent character of SCE's conduct.[13]

Although Plaintiff's expert claimed the light pole should have been placed as far away from the road as possible (in this case, 12 feet), the evidence shows that Dimeo was traveling at approximately 74 miles per hour at the point of impact. Even if the light pole had been placed 11 feet further away from the road, as suggested by Plaintiff's expert, given the speed of Dimeo's car the added distance would have only delayed the inevitable crash by less than one second. Moreover, Dimeo's car traveled across all lanes of traffic before hitting a light pole on the west side of the road. As SCE posits, "How do we then account for southbound driver[s] who become involved in similar accidents which veer off the roadway, jump the west curb and travel the same distance as the Plaintiff? Wouldn't the so-called twelve-foot safe distance now be unsafe given the fact a southbound traveler, traveling the same distance as the Plaintiff, would have struck the very pole Plaintiff's expert now opines was a safe distance?"

To impose the duty on SCE, or any other entity, to ensure a "safe landing" for all, would create a heavy burden. While the majority finds the evidence "insufficient to establish any meaningful additional burden to SCE of installing safer light poles" (maj. opn., *ante*, at p. 1278), I find the testimony of Plaintiff's expert, Anderson, sufficient evidence of such burden. Anderson testified that the light pole should have been placed as far back (here, 12 feet) as possible. Furthermore, he testified that the arm of the light pole in this case looked to be about eight to 10 feet. If the pole is placed farther back, Anderson testified that the arm would need to be 12 feet plus the additional width of the lane, or "20, 25–20 feet mainly is common." Common sense dictates that if the arm must be 12 feet longer than it currently is, the cost will increase. Furthermore, SCE will not have to relocate just this light pole, it will have to relocate all of the light poles. Such task would be quite burdensome when considering the number of light poles in

---

[13] Again, I would note there is no evidence in the record that SCE had any control over the decision as to where the light pole would be located. Instead, that decision was made by the engineers hired by the government entities, in compliance with the accepted guidelines and standards.

the City, the County, and throughout the state. (*Coates, supra,* 731 A.2d 931, 944 ["To make liability in every accident a jury question would, we expect (1) quickly remove the availability of affordable liability insurance for utilities, and (2) effectively force them to move hundreds, if not thousands, of poles, at enormous cost and inconvenience to them and to their customers and, even then, without absolute assurance of safety."].)

What the majority is proposing is a nightmare. SCE is not in the business of researching and studying the best placement of utility poles. Such business is left to the proper governmental agencies. However, according to the majority opinion, no longer will a utility company be able to rely on city and county engineers working on behalf of the governmental agencies, in compliance with government sanctioned highway and safety engineering studies and manuals, to direct the location of utility poles. Rather, the utility company will have to hire its own engineers. However, even if the company bears the burden and expense of hiring its own engineers, there is no assurance that it will avoid liability, because clearly the use of the accepted standards (CalTrans Highway Design and Traffic Manuals and Standard Plans, and AASHTO manuals, including the 2004 edition of "A Policy on Geometric Design of Highways and Streets" and the "Roadside Design Guide") fail to provide a "safe landing" for all![14]

## IV. PUBLIC POLICY

Foreseeability is not the only test in our determination of whether SCE owed a duty to Plaintiff. We also employ public policy considerations. If, as the majority proposes, we cannot state that SCE had no duty, as a matter of law, "to . . . install[] safer light poles" (maj. opn., *ante,* at p. 1278), and if it is a question of fact for the jury to decide, then we must consider the implications of such proposition. Should there be a "safe landing" on the side of every road? If so, what will it cost?

Beginning with the instant case, was the fact that the light pole was placed in the exact pathway of Dimeo's car the cause-in-fact of the accident? Considering the distance Dimeo's vehicle had already traveled before hitting the light pole, there is no evidence to suggest that placing the light pole

---

[14] The majority faults my emphasis on the AASHTO manuals and the declaration of Nahabedian to further support my finding of no duty on SCE's part. The majority opines that "[w]hether design criteria was complied with, goes to the standard in the community and the issue of 'breach of duty.'" (Maj. opn., *ante,* at p. 1277, fn. 8.) I disagree. I view the evidence as a factor in the circumstances that must be considered in determining the existence of duty.

farther back would have made a difference.[15] What if there had been a tree in the same place as the light pole? What about a parked car, or a brick mailbox, or a fire hydrant? "Carried to its logical conclusion, [the majority's proposition] would require a landowner to remove every tree, fence, post, mailbox or name sign located on his property in the vicinity of the highway, or permit them to remain, subject to possible liability. . . . [¶] Moreover, such a rule would result in limiting the owner's use of that portion of his property which abuts the road, and would be equivalent to a taking of private property for a public use without just compensation, in violation of our State Constitution (art. I, § 7, subd. [a])." (*Hayes v. Malkan* (1970) 26 N.Y.2d 295, 299 [310 N.Y.S.2d 281, 258 N.E.2d 695, 696].)

What would it cost to relocate every light pole, utility pole, or stop light pole to as far away from the road as possible? Who should bear this cost? Are accidents like the one before this court so common that the benefit of imposing a duty to protect motorists involved in such accidents outweighs the burden of relocating all fixed objects along the road? More importantly, at what point should we prohibit the placement of any fixed object on the side of the road?

Again, recognizing that accidents involving fixed objects on the sides of roads are a possibility, we must consider what common sense dictates. Ideally, if a road is designed to attain optimal roadside safety, it would look like the landing strip at an airport. However, this is not practical. Our roads are, and must be, designed to accommodate the needs of the community (including motorists) while considering the rights of adjacent landowners. As such, guidelines have been established (AASHTO Roadside Design Guide, etc.) so that necessary fixed objects (lights, warning signs, etc.) can be placed in close proximity to the traveled portion of the road without hindering motorists who are using the road. Nonetheless, even with the use of these guidelines, there is no way to ensure a "safe landing" for all. Therefore, it is unreasonable for a motorist to expect that upon the loss of control over his or her vehicle, whatever lies on the other side of the curb will provide a safe landing.

For the above reasons, I conclude the trial court properly granted summary judgment in favor of SCE. Dimeo's conduct (test driving his parents' Porsche at a speed in excess of 100 miles per hour, hitting another vehicle, losing control, crossing over three 12-foot-wide lanes of traffic, jumping the eight-inch concrete curb, skidding down the sidewalk, and hitting a light pole several feet from the lane in which the motorist was traveling) was not a

---

[15] As noted earlier, given the speed of Dimeo's car, if the light pole had been placed 11 feet farther back, as Plaintiff's expert suggested, it would have delayed the inevitable crash only by less than a second in time.

natural or typical consequence of the placement of a light pole on the side of the road. Nor was the foreseeability of the likelihood of his conduct one of the factors contributing to the negligent character of SCE's conduct.[16] Accordingly, I would hold that, as a matter of law, SCE owed no duty to Plaintiff.

## V. CONCLUSION

Here, I do not begin with the assumption that SCE controlled the decision on where to place the light pole. More importantly, I conclude there is no duty to provide a "safe landing" for all motorists. It is unreasonable to expect SCE to anticipate and guard against the accident that occurred in this case. Accordingly, I would affirm the judgment in its entirety.

For the above reasons, I concur only with the majority opinion affirming the trial court's grant of summary judgment in favor of Edison.

Respondents' petition for review by the Supreme Court was denied October 28, 2009, S175969. Baxter, J., was of the opinion that the petition should be granted.

---

[16] See footnote 13, *ante*.